**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**JEFFREY C. LAKE** and )
**GERALD PATTERSON** )
and )
**EQUAL EMPLOYMENT** )
**OPPORTUNITY COMMISSION** )
) 2:03cv517
Plaintiffs, ) Electronic Filing
)
v. )
)
**AK STEEL CORPORATION**, )
)
Defendant. )

## OPINION

Plaintiffs Jeffrey Lake and Gerald Patterson ("Lake and Patterson") commenced this civil

rights action seeking redress for discrimination in the terms and conditions of employment based

upon alleged unequal treatment on account of their race, African American. Their amended

complaint sets forth causes of action for race discrimination in violation of 42 U.S.C. § 1981,

Title VII and the Pennsylvania Human Relations Act ("PHRA"). Lake and Patterson's claims

stem from specific instances of discipline alleged to be discrete acts of invidious race

discrimination occurring within an environment asserted to be permeated with racial hostility and

ridicule. They seek an award for lost wages and benefits, compensatory damages, and punitive

damages. They also seek injunctive relief directing defendant to (1) institute and carry out

appropriate diversity training programs, (2) destroy all written derogatory comments and

disciplinary files regarding them, (3) expunge all references to the circumstances of any such

discipline, and (4) award all other relief deemed appropriate by the court.

The Equal Employment Opportunity Commission ("EEOC") commenced a related action

at Civil Action No. 03-1321 seeking partly overlapping relief on behalf of a class of eight

minority workers ("class members") that includes plaintiffs Lake and Patterson, which the court

consolidated with Lake and Patterson's action on August 26, 2004. The EEOC seeks both

damages and injunctive relief to redress the class members' asserted exposure to a racially hostile work environment.

Plaintiffs Lake and Patterson present claims of individual disparate treatment that assertedly occurred as part of the general hostile work environment underlying the claim brought by the EEOC on behalf of all class members.   They allege that over a substantial period of time defendant has permitted an environment to exist and flourish in which (1) the use of racial epithets, insults and slogans are tolerated and go unpunished; (2) security personnel and contractors are permitted to display flags and emblems that reflect racial hostility; (3) persons of color are subjected to unwanted horse play, offensive touching, verbal abuse and/or disrespect on account of their race and perpetrators of such conduct are not punished; (4) they have been denied an equal opportunity to train and advance in job openings in comparison to the opportunities provided to white employees; (5) their supervisors have discriminatorily enforced plant rules with respect to attendance, safety, and personal deportment against them and other persons of color; (6) their supervisors are permitted to discriminate on the basis of daily assignments, job requirements, procedures and protocols by demanding more scrupulous performance or observance of the same by non-white  employees; (7) they are subjected to drug testing and medical examinations more frequently than their white counterparts; (8) they and other persons of color have been intimidated on account of their race, threatened with discharge, and discharged based upon false and/or incorrect information, and only reinstated after prolonged, enforced suspensions from employment; (9) defendant has been willfully blind to the complaints they and others have made about the environment and the disparate actions of their supervisors; (10) retaliation has been taken against them and others who have complained about the hostile atmosphere; and (11) a system of peonage, oppression and fear has developed against persons of color.

The EEOC seeks to establish that all class members were required to work in a hostile environment wherein the use of racial slurs and epithets were prevalent, racial graffiti and

2

symbols of white supremacy were routinely displayed and minority employees were ridiculed and humiliated by co-workers and supervisors. Defendant failed to implement effective measures to eradicate and prevent the offensive environment and led employees to believe they would be subject to retaliation if they complained about the environment or assisted others who did. Through these actions defendant assertedly tolerated and condoned a racially hostile work environment.

Defendant has moved for summary judgment as to all claims on the grounds that it had legitimate, non-discriminatory reasons for any adverse actions taken or employment decisions made regarding any class member, including Lake and Patterson, which actions and decisions cannot be shown to be pretext.[1] In addition, all of plaintiffs' claims predicated on a hostile work environment fail because it purportedly cannot be held liable for any conduct occurring before it acquired the plant on September 30, 1999, and it took prompt remedial action under its anti-discrimination policy on any harassment brought to its attention thereafter. Consequently, plaintiffs cannot overcome the legal effect from defendant's maintenance and administration of that policy. Finally, defendant asserts Lake and Patterson failed to exhaust their PHRA claims and the record will not support the imposition of punitive damages.

Plaintiffs maintain that the evidence of record is more than sufficient to support the existence of a racially hostile work environment attributable to defendant. Lake and Patterson further argue the record will support findings that they have been the victims of discrimination within this environment at the hands of their supervisors, and each has been terminated pursuant to standards and practices not applied to white employees. These challenged standards and practices have been found to be inappropriate under the controlling collective bargaining

---

[1]Defendant's motion for summary judgment on Lake and Patterson's claims was filed before the cases were consolidated. Defendant subsequently filed a motion for summary judgment on the claim brought by the EEOC on behalf of the class members. The court will reference Lake and Patterson's and the class members' claims separately as appropriate and will use the term "plaintiffs" to refer all class members and claims collectively.

3

agreement by separate arbitrators. Lake and Patterson further assert they have been disciplined and/or suspended under similar circumstances, and, from their perspective, these tangible employment actions remove any impediment to liability that would otherwise arise from the existence of defendant's anti-discrimination policy. And plaintiffs argue that material issues of fact remain about the propriety and effectiveness of defendant's administration of its anti-harassment policy at the Butler Works in any event.

For the reasons that follow we agree that the record contains sufficient evidence to support liability against defendant on all of plaintiffs' claims and that material issues of fact remain about the propriety and effectiveness of defendant's administration of its anti-harassment policy where it appropriately can be raised as an affirmative defense. Accordingly, defendant's motions for summary judgement must be denied.

Federal Rules of Civil Procedure 56 (c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's claim, and upon which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim. National State Bank v. National Reserve Bank, 979 F.2d 1579, 1582 (3d Cir. 1992). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574 (1986) (quoting Fed.R.Civ.P. 56 (a), (e)) (emphasis in

4

Matsushita). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

It assessing whether material issues of fact remain for trial, the court must read the record in the light most favorable to the non-moving party. GTE Corp. v. Allendale Mutual Insurance Co., 372 F.3d 598, 602 (3d Cir. 2004). It also must draw all reasonable inferences in that party's favor. McCarthy v. Recordex Services, Inc., 80 F.3d 842, 847 (3d Cir. 1996). If the non-moving party's evidence merely is colorable or lacks sufficient probative force summary judgment must be granted. Anderson, 477 U.S. at 249-50; see also Big Apple BMW, Inc. v. BMW of North America, 974 F.2d 1358, 1362 (3d Cir. 1992), cert. denied, 113 S.Ct. 1262 (1993) (although the court is not permitted to weigh facts or competing inferences, it is no longer required to "turn a blind eye" to the weight of the evidence).

The record as read in the light most favorable to plaintiffs reveals the backdrop that follows. All class members work or worked for defendant at its plant in Butler, Pennsylvania, know as AK Steel's Butler Works. The Butler Works is a large industrial plant covering over 1300 acres. Defendant acquired the plant from Armco, Inc., on September 30, 1999. Defendant manufacturers electrical parts and stainless steel at the Butler Works and employs more than 1,900 individuals at the plant. The workforce at the Butler Works is less than three percent minority. Fewer than twenty workers are African American.

Lake and Patterson were union employees covered by a 1996 collective bargaining agreement between the Butler Armco Independent Union and Armco, which AK Steel was obligated to honor upon its acquisition of the plant. In 2001, the union and AK Steel entered into a new collective bargaining agreement.

Lake is a member of the plant's hourly labor department and was working at the time in question as a van driver for the "stores department." He continued to work in that department at all relevant times. Patterson was a member of the hourly cold mill department and was working during the time in question as a utility worker. He continued to work for defendant until May of

5

2004, when he resigned.[2]

Lake became employed at the Butler Works in 1979. Over the next 22 years he worked in a number of positions within the labor department and for numerous supervisors. These positions included laborer, grounds keeper helper, grounds keeper, sewer man helper, sewer man, truck washer, truck repair shop helper and truck driver. During this time Lake had an unblemished record except for one minor incident involving the failure to wear safety glasses in a restricted area.

Prior to 1998 Lake successfully bid on a driver position in the labor trucks department. In 1998 Lake requested and received an assignment as a van/truck driver for the storeroom department ("storeroom"). The storeroom is the central place of distribution for most packages delivered to the plant. As a van driver within the department Lake was required to deliver packages throughout the mill, like a UPS driver. In addition to Lake there were two other storeroom delivery drivers, another van driver and a stake truck driver.[3] Lake maintained this position without incident over the next three years.

In January of 2001, Joan McGarvey ("McGarvey") became the supervisor of the storeroom. Although Lake formally worked out of the labor trucks department, he also came under the supervision of McGarvey because his duties were centralized in the storeroom.

Prior to January of 2001, employees in the storeroom were permitted to utilize what was known as "flextime," which meant that the employee could elect to commence his shift at 6:00, 6:15 or 6:30 a.m., and work for eight hours thereafter. Prior to McGarvey becoming the supervisor of the storeroom Lake made his election on a daily basis. After McGarvey became supervisor, she eliminated Lake's ability to utilize a daily "flex" schedule. McGarvey insisted Lake pick a set starting and ending time and after he failed to do so she unilaterally set Lake's

[2]Patterson met an untimely demise on March 9, 2005. On June 13, 2005, the administratrix of his estate was substituted as a party plaintiff.

[3]The stake truck was used to deliver significantly larger and heavier items that at times required the use of a forklift.

6

daily schedule.

In April of 2001, Lake was required to deliver a shipment of pocket knives that were to be given as a safety award. The original order was for 125 knives, and a box of knives purportedly containing that number was received in the storeroom. Lake was directed to deliver the box to the silicone processing department, which had an upstairs office off the beaten trail. Lake delivered the package to the downstairs office in the department and was advised by the supply person on duty that delivery in that manner was sufficient and effective. Lake did not obtain the signature of the employee who accepted the knives at the silicone processing department, but his delivery of the package to the downstairs office in that manner was common and acceptable protocol for the delivery/receipt of similar packages. The silicone processing clerk subsequently picked up the package and took it to her office. There was no evidence that the box had been tampered with and the packing slip was inside, as normal. The clerk gave the box to another employee who was involved in distributing the safety awards and she subsequently determined that there were only 115 knives in the package. Based on the condition of the box when received and the surrounding circumstances, the silicone processing clerk formed the belief that the vendor had shipped the order short.

Upon learning that the order was short, McGarvey confronted Lake and directed him to go back to silicone processing and find the missing knives before the end of the day. She did so in a demeaning and humiliating manner, implying that Lake had stolen the knives. McGarvey did not question any other employee before confronting Lake and implying that he was responsible for the missing knives. Lake went back and talked to the silicone processing clerk, but was unable to determine what had happened to the knives.

When McGarvey implied that Lake was responsible for the missing knives and knew of their location, Lake became upset and raised his voice in a defensive and agitated manner. This reaction was understandable given the nature of McGarvey's inquiry and directives. During the course of the conversation Lake became more agitated. At one point during a subsequent

7

exchange with Randolph Lake referred to McGarvey as the "god damn lady." Randolph told Lake to calm down. After Lake became more agitated, McGarvey ended the conversation and returned to her office.

A short time later Lake and Randolph continued to discuss the incident and Lake was talking very loudly. McGarvey and Randolph again attempted to calm him down. At the end of the conversation Lake turned and said as he was walking away: "fucking lady." Although using foul and abusive language, Lake did so as he was walking away and did not make either statement to McGarvey's face.

Subsequently, defendant determined that Lake had violated the plant rules prohibiting abusive language and disorderly conduct by directing foul language at a supervisor. Lake was suspended for ten days and informed that "similar behavior of this nature may lead to further disciplinary action, up to and including discharge."

In the summer of 2001, Lake approached defendant's manager of human resources at the Butler Works, Rick Winter, about filing a complaint for harassment, but elected not to do so after Winter advised Lake that there were no forms to fill out and Lake would just verbally have to apprise Winter about any matter he wished to raise. Approximately one week later, Winter contacted Lake out of a concern that he was not reporting workplace harassment. Lake and Winter met on August 15, 2001, and Lake complained about the treatment he was receiving from McGarvey.

McGarvey had formed the belief that Lake was "killing time" during the workday.[4] Lake in turn had formed the belief that McGarvey, and two other salaried employees, Cheryl Moodie and Denny Randolph, were checking on his whereabouts near the end of his shift. Randolph, who previously had held a salaried position in inventory control and worked as a temporary supervisor in the storeroom under McGarvey, had been directed by McGarvey to monitor Lake at

---

[4]McGarvey claimed to have received reports from an unidentified source that Lake was "killing time" near the end of his shift. However, McGarvey has never been able to identify the source of these reports.

the beginning and end of each day to assure that he was timely reporting to work and performing work-related tasks throughout the entire shift. McGarvey and Randolph also developed and implemented a requirement that delivery personnel receive a signature for each delivered package and record the date and time of delivery on each invoice. McGarvey developed these requirements so she could monitor Lake's whereabouts throughout the day. McGarvey and Randolph believed this was an effective way to "watch" Lake and assure he went from place to place in the most efficient way. This policy was not enforced with regard to the stake truck driver or the other van driver. McGarvey had never received reports of the other two drivers within the department "killing time", nor had she ever attempted to monitor a white employee's compliance with the daily work schedule.

In the meeting with Winter, Lake voiced his concern that McGarvey had singled him out for special treatment. Winter developed various interview questions and assigned an individual under his control, Leslie Bergbigler, to interview McGarvey, Moodie and Randolph regarding Lake's allegations of disparate treatment. Bergbigler's investigation produced a determination that McGarvey had placed an emphasis on efficiency and productivity when she took over the department and had developed new protocols for carrying out various tasks. Everyone was required to comply with the new procedures. Winter accepted the statements of the supervisors denying any improper intent and Bergbigler's conclusions without hesitation. He summarily dismissed any contrary allegations by Lake.

On August 20, 2001, McGarvey announced a new routing and tracking procedure. In response, Lake asserted his seniority rights permitted him to drive the stake truck and indicated he would begin driving it the next day. McGarvey stated she was unfamiliar with and did not know whether seniority rights could be used to claim a specific position within the storeroom. After further discussion, the members of the storeroom department could not reach a consensus, and McGarvey agreed to investigate the matter. She then directed each employee to continue in their current position until clarification was obtained.

9

The following day Lake reported to the acting foreman in the trucks department and asked if McGarvey had contacted him regarding whether seniority permitted an employee to operate the stake truck. She had not. Lake then reported to the storeroom and saw a note from McGarvey on the bulletin board indicating she had not yet resolved the issue, but was continuing to investigate. The note directed the employees to continue in their prior positions. It also assigned a priority delivery to Lake. Lake decided not to drive the van and continued with his own investigation into the impact of seniority rights with regard to specific job assignments in the storeroom.

After a few hours Randolph approached Lake and began to question him about the performance of his duties that morning. Lake obtained a union representative and then reported to McGarvey's office. McGarvey expressed concern about the four hours that had elapsed and Lake's failure to do any work, in specific contravention of her order directing him to drive the van and make priority deliveries. McGarvey gave Lake a five day suspension with intent to discharge for failing to perform work, disregarding a directive, and leaving the work site.

Lake protested the suspension and raised the issue of whether he was required to take instruction from McGarvey. Because the reporting structure within the company was not clear, Lake was permitted to return to work after an eighteen day suspension.

On September 26, 2001, McGarvey ascertained that Lake had delivered several packages without obtaining signatures on the packing slip. McGarvey posted the new delivery procedures on the bulletin board and gave each driver a copy, including Lake. The drivers were reminded that all deliveries except for those made with the stakes truck required a recipient's signature. Otherwise, the item was to be returned to the storeroom until a signature could be obtained. In light of Lake's failure to obtain signatures, McGarvey directed Lake to meet with her personally and review the policy to ensure he understood it. Lake reported to McGarvey's office. McGarvey explained the importance of the procedures and Lake asked whether he needed union representation. McGarvey assured that the meeting concerned only the review of policy and that

10

union representation was not necessary. She then handed him a copy of the delivery procedures and directed him to read item six aloud, which reflected the signature policy, in a demeaning and humiliating manner. Lake responded by reading item six loudly.[5] McGarvey reiterated the policy to Lake, but Lake refused to continue the conversation. Lake received a five day suspension for insubordinate refusal to converse with McGarvey about department procedure. McGarvey wrote a letter to Lake indicating his behavior could not continue, and similar behavior would lead to additional disciplinary action, including discharge.

On November 1, 2000, Lake placed on McGarvey's desk a copy of a written request to work seven hours that day. Lake did not include an explanation with the request although it was standard practice to do so. McGarvey summoned Lake to her office. A short time later McGarvey witnessed Lake making a xerox copy. McGarvey demanded an explanation because Lake was not permitted to use the copier for personal business without permission. Lake explained he was providing a reason for his request and believed this was obvious from the surrounding circumstances. Lake indicated he would provide the request as soon as the copying process was complete, but McGarvey insisted on an immediate verbal explanation. When it was not immediately forthcoming, McGarvey construed Lake's actions as insubordination. She then denied Lake's request and directed him to deliver two packages. Lake refused to deliver the packages until he had finished photocopying the request and explanation. McGarvey advised that failure to follow the directive would lead to disciplinary action. When Lake refused to follow the directive, McGarvey directed him to leave the plant. Lake indicated he "wasn't going anywhere" and McGarvey summoned plant security to escort Lake from the plant.

From the start of the incident McGarvey confronted Lake in a manner that reflected hostility and mistrust.[6] Lake became startled and raised his voice with McGarvey. Lake did not

---

[5]Lake has a naturally deep and loud voice.

[6]An arbitrator subsequently determined that "one could hardly imagine a better example of supervisory pettiness" and indicated McGarvey had adopted a policy of directing Lake through

hear McGarvey direct him to deliver packages before she told him to leave the plant, and believed he simply had been instructed to leave the plant. Lake insisted that security escort him from the plant out of fear of being accused of absenteeism. This fear was based on an earlier incident where he had been disciplined for leaving and was advised that he had to be escorted out by plant security under such circumstances. Lake was discharged after the November 30, 2001, incident. Lake's discharge was based in part on the fact that he had three prior incidents of unacceptable behavior in the past eight months.

Lake grieved his discharge under the collective bargaining agreement. The arbitrator considered all four incidents wherein McGarvey charged Lake with insubordination and disrespect. He reached "the inescapable conclusion that [Lake] and [McGarvey] had developed a mutual hostility and mistrust for one another." And although Lake's misconduct was deemed significant, the arbitrator indicated that "his mistrust and hostility towards [McGarvey] may well have been provoked." The arbitrator found that McGarvey clearly had raised the inference of theft by the manner and tone in which she first questioned Lake about the missing knives. Similarly, the arbitrator determined that forcing Lake to read a department policy rule aloud in front of others was not instructive but demeaning and humiliating. This treatment justifiably led Lake to create a documentary record regarding his contacts with McGarvey whenever feasible, even though his insistence on the particular occasion in question might not have been justified. In light of the mutual hostility and mistrust that had developed in part due to McGarvey's "oppressive management style," the arbitrator found discharge to be inappropriate and reduced the matter to a disciplinary suspension of sixty days.

Lake returned to work in February of 2002. On his first day back he suffered a brain aneurism and was life flighted to a Pittsburgh hospital. He was off work for a lengthy period of time and returned to work in 2003. In January of 2004, McGarvey had Lake's storeroom bid

---

hectoring and abuse instead of leadership skills.

revoked and he was returned to the labor trucks section.[7]

Patterson began working at the Butler Works on April 12, 1999. He held a variety of positions during his first year and then bid into the cold mill. Patterson worked in that department until July of 2003, when the number two tandem cold mill became idle. At that point he was transferred to employment reserve, which is defendant's plant wide labor pool.

Patterson developed an attendance problem while he worked in the cold mill department. On January 26, 2001, Patterson's immediate supervisor, Jeffrey Cordray, met with Patterson and a union representative to discuss his absenteeism. Between April of 2000 and January of 2001 Patterson had missed twenty-three days, which was unacceptable. During the meeting Patterson expressed genuine concern and indicated he understood the need to improve. Patterson committed to making such an improvement and Cordray issued a written warning that emphasized the need for immediate improvement in attendance, with the standard cautionary indication that further absenteeism could result in disciplinary action up to and including discharge.[8]

Patterson's work attendance did not improve. One week later Patterson missed two days prior to a week of scheduled vacation. He missed another day shortly thereafter. On February 28, 2001, Patterson and union representatives met with Cordray to discuss the situation. Cordray reiterated the seriousness of Patterson's absenteeism and emphasized the need for correction notwithstanding the personal issues Patterson was raising in mitigation. During the course of the meeting Cordray observed that Patterson had a tendency to miss work around scheduled vacations and on Fridays and Saturdays. Patterson again indicated he understood the seriousness

---

[7]Any claim for disparate treatment based on this employment action is not part of the instant action.

[8]Cordray met with two other employees around the same time: Jeff Quast and Steve Putney. These employees also had missed several days in 2000 and had received written warnings based on their records of absenteeism.

13

of the situation and intended to improve. Cordray gave Patterson a one day suspension and warned that further absenteeism would result in additional discipline, up to and including discharge.

In early March, 2001, five coils produced in the cold mill department were incorrectly banded. The problem was traced to Patterson's unit. Cordray conducted an investigation and determined that three employees, including Patterson, were at fault. Each of the three were disciplined, but only Patterson received a three day suspension. The others received warnings. Cordray and defendant justified this difference based upon the employees' existing disciplinary records.

Patterson missed another day of work on March 16, 2001, which was one week after the disciplinary meeting concerning the improper banding incident. He also missed work on March 23, 2001, which was three days after he returned from the three day suspension imposed as a result of that incident. When Patterson returned to work on March 26, 2001, Cordray subjected him to a drug test on the premise that he had a suspicious pattern of absences. Patterson tested positive for cocaine and admitted he had used the drug.

On April 24, 2001, Cordray met with Patterson and a union representative to discuss Patterson's attendance. At that point Patterson had missed eight days in 2001, the last two of which were Fridays. Cordray accused Patterson of not taking his employment seriously, and on April 30, 2001, Patterson received a five day suspension with intent to discharge. He was discharged on May 6, 2001.

Cordray kept a large, color-coded calendar in plain view on his office wall depicting Patterson's absences. Cordray did not visually record the absences of any white employees in the department, notwithstanding similar attendance problems by Quast and Putney. These employees also were not drug tested. Cordray terminated Patterson following his first positive drug test. No white employee had ever been discharged following a first positive drug test. When confronted with an alleged violation of the collective bargaining agreement, Cordray

14

indicated the drug test had nothing to do with the discharge. A neutral arbitrator rejected this claim and determined Patterson had inappropriately been discharged for a first positive drug test. Patterson was reinstated. No other employee had ever been treated in this manner.

In May of 2003 a metal pin broke in the machine Patterson was operating. He was given a drug test following the incident, which was normal protocol under the circumstances. Patterson also had a mobile equipment card, although he never operated mobile equipment. All employees who have such cards must be randomly drug tested annually. The arbitrator ruled that defendant could randomly drug test Patterson two times following his return to work. Patterson submitted to the two drug tests, both of which were negative. These tests were in addition to the drug test following the break down of the machine in May of 2003.[9]

Each class member testified about the environment at the Butler Works. Class member Ronald Edwards ("Edwards") was hired in 1979 and experienced racial graffiti from that point on. The graffiti directed at him typically appeared in the restroom in the vicinity of his work site and made reference to "nigger Edwards" or "nigger Ron." Edwards regularly reported various incidents of racial graffiti between October of 1979 and January of 1983. In January of 1983 someone scratched "nigger Edwards" on his locker door. Edwards reported it. Around the same time additional writing on stairs and walls began to appear involving derogatory graffiti directed at Edwards' race. Several of these were references to "nigger Edwards." Edwards continued to report the matters to his supervisors. After it was reported the supervisors sprayed over the graffiti or tried to scratch it off. At times the graffiti continued to be visible through the attempted cover over. Nothing further was done.

Edwards eventually bid into another section of the mill and things went well for a while. Thereafter, however, the racial graffiti began to reappear. Edwards again reported it and nothing other than covering it over or attempting to do so was done by management. After a while Edwards stopped turning things in because nothing was ever done. He came to the realization

---

[9]Quast and Putney were not drug tested during this period of time.

15

that it had become "a way of life" at the Butler Works and inevitably he would have to endure the presence of racial graffiti throughout his twenty-six years of employment.

Edwards continued to witness racial graffiti after AK Steel acquired the plant. More recent examples included the drawing of three male penises with the names "Artie," "Dave," and "Ron" above them, which appeared in the restroom at "Plant No. 2."[10]  The drawings were fairly large in size and plainly visible inside a restroom stall used both by union and management employees. It was the only restroom in that general area of the mill.  The graffiti remained throughout the Spring of 2003.  Edwards and Potts subsequently discussed it and the two "just laughed" because it was nothing new.

Edwards also recalled seeing graffiti in the restroom in the hot mill section of the main plant.  There was a small standup urinal with a partition wall around it.  Scrawled on the side was the statement "Nathan Vanderzee is a half breed nigger."  This graffiti was plainly visible in September of 2003 and foreman and supervisors in that area used the urinal on a frequent basis. The graffiti was at eye level when facing the urinal.

A piece of paper appeared on the bulletin board in the machine shop in November of 2003.  It stated:

Wanted: Truck Drive

Want two short niggers for mudflaps, preferably with chrome tennis shoes.

The bulletin board was part of the main plant area.  After finding the posting Edwards tore it down and did not report it or discuss it with others.  Edwards had just recently started a job which required him to travel into that area, and he believed the posting was directed at him because of his race.

At various times in 2003 Edwards heard individuals using the term "sand niggers" and saw graffiti containing that phrase.  He did not report these incidents to management or discuss

---

[10] Artie Johnson and Dave Potts are additional class members.

16

them with others. He also heard talk referring to equipment being "nigger rigged," but again did not report the statements to management or discuss them with others.

In December of 2003 Edwards began running crane and was no longer on the plant floor regularly. He frequently witnessed swastikas approximately twelve inches in size painted on a railroad car owned by defendant. The car regularly traveled from the melt shop to the hot mill. Edwards did not report the swastika but he was aware that class member George Holmes had reported them.

Class member David Potts experienced a similar environment. Periodically he heard people make derogatory comments using the word "nigger." Following the collapse of the World Trade Centers on September 11, 2001, graffiti appeared in the mill which stated "kill all the sand niggers." It was present in the bathroom by the vending machines at Plant No. 2. Potts worked in Plant No. 2 until it became slow and closed near the end of 2003. The graffiti in the restroom was right over the top of a urinal and remained there for some time until someone took a marker and drew a line through it. Even after that, it remained visible and legible.

Potts began working in the melt shop after Plant No. 2 closed. In the latter part of 2003 someone gouged into a door leading out of the melt shop graffiti the phrase "get rid of all the niggers here." The door was at the bottom of a set of stairs leading up to the masonry area where Potts was assigned. The phrase was scratched into the woodwork in approximately four inch letters and could be seen for some distance.

Potts also traveled into the cold mill after Plant No. 2 closed. There, he witnessed a picture of a stick figure, poignantly colored black, behind a jail window. Beneath the drawing was the phrase "Frosty ought to be behind bars for what he did." Potts later came to understand that Frosty was another African American employee and made the connection between the graffiti and the co-worker. Potts witnessed this incident sometime between 2002 and 2003, after work became slow at Plant No. 2 and he began traveling to various locations while working out of labor reserve.

17

Potts also witnessed numerous swastikas during the same time. A number of these were in restroom stalls and locker rooms as well as in various walking tunnels in the main plant. They also appeared just outside bathrooms on the walls. The swastikas often appeared by themselves and without additional writing. Potts witnessed at least ten separate swastikas that were commonly two or three inches in size. He perceived them to be aimed at any non-white individual.

Potts similarly witnessed the acronym "KKK" written on the walls. This symbol appeared at numerous locations in Plant No. 2. On one such occasion the acronym was written on a locker and remained there for at least six months before it was sprayed over pursuant to a plant wide campaign to remove graffiti conducted just prior to a scheduled EEOC visit. Potts was unaware of any prior spray-off campaign.

A Klansman was also present in the melt shop locker room. It was a full-bodied magic-marker drawing in the first or second stall in the men's locker room. It was about a foot in size. It was the typical robed depiction portraying a hood with two eye slits and a symbol of St. Andrew's cross on the hat and breast area of the robe. The locker room in the melt shop was one of the first encountered when entering the plant at the main entrance. Potts also was exposed to similar Klansman figures at various times while he worked in masonry in 2002 and 2003.

Potts couldn't help but feel that the graffiti throughout the plant was directed at his race. Its prevalence made him feel as if tension was in the air. This was particularly true because much of the graffiti appeared in locker rooms and bathrooms used by turn foreman and other management personnel. At times, Potts would be using such a facility at the same time turn foreman or other manager personnel were using it. And upper management either used such facilities regularly, or had access to them.

Class member George Holmes ("Holmes") also witnessed graffiti on restroom walls, railroad cars and in plant areas where other class members worked. He also was forced to endure racial jokes, slurs and comments throughout his career at the Butler Works.

18

Holmes recalled the presence of graffiti involving other African American workers. He witnessed graffiti stating "Nate Vanderzee is a half breed nigger," "Ron Edwards is a lazy nigger," and "Kevin Frost is a lazy nigger." These and similar phrases were scratched into urinal walls and other locations in the hot mill and Plant No. 2 at various times after Holmes was hired in 1997 and appeared up through and including 2003. Holmes had worked at Plant No. 2, the hot mill and as a overhead crane operator. The inter-plant railroad cars had numerous swastikas on them which at times were accompanied by phrases such as "slab Nazi." The graffiti on the railroad cars was clearly visible and moved throughout the plant where it could be seen by everyone.

Holmes reported the presence of various forms of graffiti to his immediate supervisor such as the salaried turn foreman or the step-up foreman. For example, after viewing the graffiti about Nathan Vanderzee, Holmes reported it to the turn foreman for the hot mill, Ben Geil. The foreman said he would take care of the matter and have it painted over. The image was scratched into the surface, and although it subsequently was painted over, the phrase was still visible. At one point Holmes was speaking to the head of the maintenance department, Joe Spahn, and commented that the graffiti was getting a little out of hand. Holmes referenced a few examples when Spahn indicated he was unaware of what Holmes was talking about and Spahn responded that he was sure the turn foremen would take care of the matter in due course. After the Vanderzee graffiti was painted over but could still be read, Holmes brought the matter to the attention of a new turn foreman that had been assigned to the area. Holmes was assured that the matter would be taken care of, but nothing happened. No effort was made to scrape the paint so the graffiti was no longer visible. Holmes continued to perceive the response as inadequate because "all they did was paint it over and say it's covered up" when it remained legible through the paint.

Holmes also experienced threatening graffiti that was specifically directed at him. On December 31, 2002, Holmes was written up by his turn foreman for having untied work boots.

19

He was working as an overhead crane operator. The next day, a co-worker, Rudy Digregorio, who was working in the crane beside Holmes, found a drawing on a standard size piece of paper depicting a Klansman on a cross engulfed in flames. The statement "tie your boots!!!" appeared at the bottom of the cross and was underlined. Digregorio contacted Holmes in the middle of his shift and gave him the picture. Holmes, accompanied by Digregorio, gave a copy of the drawing to the turn foreman, Bill Comer, and sent a copy to Ben Kerl. From there, the matter was brought to Winter's attention.

On January 2, 2003, Winter asked the crane operator who had worked the night shift, Larry Fleeger, if he had seen the drawing. Fleeger indicated he had, but said he hadn't touched it because it wasn't his "bid" crane and he didn't like to touch things in anyone else's crane. Fleeger admitted not reporting the incident. Winter also discussed the incident with Holmes, and asked if he knew who had created the drawing. Holmes indicated he had only been back in the hot mill for about a week and thought he was getting along with everyone. Holmes suggested a co-worker, Nate Black, might have made the drawing, but admittedly drew this inference based on Black's attitude and presence in the area the previous day, and therefore couldn't be sure.

Winter conducted a search of Digregorio's and Fleeger's lockers. Inappropriate material depicting women as sex objects was found in Fleeger's locker.

Winter issued disciplinary letters to Digregorio and Fleeger. Although Digregorio had turned the drawing over to Holmes and accompanied him while reporting the matter to the turn foreman, Winter disciplined Digregorio for not following company protocol and taking the drawing immediately to an appropriate supervisor. Fleeger also received a disciplinary letter for failing to report the drawing to a supervisor after seeing it in the crane.

Holmes was concerned about the disciplinary measures Winter had taken. He considered Digregorio and Fleeger to be personal friends and did not believe they had anything to do with the drawing. From his perspective, Digregorio had done nothing wrong and Fleeger had nothing to do with the creation or presence of the drawing. Holmes requested that their disciplinary

20

letters be rescinded, but that did not occur. On March 4, 2003, Winter advised Holmes that the investigation was complete and management had been unable to discover who had created the drawing. Winter emphasized, however, that the imposition of discipline on Digregorio and Fleeger had "sent a strong message to the work force by investigating the situation." Winter advised Holmes that his door was always open if additional troubles surfaced.

Class member Derek Potts similarly witnessed graffiti throughout the Butler Works from the time he was hired in May of 1999 through July of 2003. It included statements in the melt shop bathroom stalls indicating "no niggers wanted here in the melt shop" and "this place is getting to be nigger heaven." The phrase "niggers should go back to Africa" was also there. On the shower wall a circle around the word "niggers" with a line through it was present.

In a bathroom by the cold mill foreman's office several phrases were present. These included a degrading drawing of Dave Clark and statements such as "kill all them niggers" and "niggers don't belong with white women." "KKK" symbols were everywhere. Similar graffiti appeared in the bathroom by the cold mill vending machines. For example, the statement "Bin Laddin is just another nigger that needs to be killed" was scratched on the wall behind the toilet. The symbol "KKK" was right over the sink. The statement "bomb those sand niggers" was present. Swastikas appeared at the main plant and down at the Plant No. 2. Derek Potts recalled seeing at least twenty-five at various locations in these areas.

Many of the statements were scratched in the surface while others were written with marker and pen. They frequently appeared in areas that would be observed by anyone using the facility. The pictures of Dave Clark in a jail cell, who was also know as "Frosty," appeared in the stalls near his work area and remained there for months. Similarly, the "KKK" symbols in the cold mill facilities remained present and visible for months.

Derek Potts also witnessed the noose hanging in the "hilltop lunchroom" as early as 2000. It was rumored that the noose had been present for many years.

Derek Potts met with Winter regarding Patterson's complaints of discrimination. Potts

21

did not inform Winter about the various graffiti he had observed throughout the facility, choosing instead to focus on the matter at hand – Winter's investigation of Patterson's complaints. Potts also made a racially derogatory comment about an aerobics instructor in front of his co-workers. The phrase was then repeated by one of Pott's co-workers to the turn foreman in a different context. When asked about the incident, Potts emphasized that he did not find derogatory comments necessarily offensive when they were used in jest between friends, but did find them offensive when they were used as a means to slight or belittle all minority workers as a class.

Class member Eric Cook likewise witnessed racial graffiti at various locations. The phrase "yo, homeboy" was written on his locker for several years. Cook did not consider the phrase to be racially derogatory and just attributed it to his co-workers clowning around. Cook did report the presence of "KKK" symbols appearing on his and Lake's lockers around the time Lake was voicing his concerns about the treatment he was receiving from McGarvey. Cook also experienced racial comments and inappropriate touching on a number of occasions.

Winter's investigation into Lake's complaints concerning McGarvey as well as his investigation into an incident between Cook and one of his co-workers had significant repercussions for Cook. Cook's co-workers became aware of Winter's investigations and in turn "blackballed" Cook, which he explained as a form of isolation and the lack of appropriate assistance from them. Cook was reluctant to report things to Winter because "he went and put it all out there and everybody clammed up." The "blackballing" from co-workers followed.

In the summer of 2000 or 2001, Cook was dispatched to fix a malfunctioning toilette in the restroom at the transportation department. Upon entering the employee break room Cook witnessed several employees viewing a video in which a young woman was being initiated into the Klu Klux Klan and receiving her robe. The employees looked up as Cook walked in, but continued to watch the video, commenting its only "Cookie". Cook subsequently was told that the female was the daughter of an employee named Charles McPherson. McPherson was believed to be the grand dragon of the Pennsylvania Klavern of the Klan. McPherson worked in

22

the transportation department. Cook reported the matter to Gerald Hesidenz, defendant's head of security and risk management. Hesidenz informed Cook that he knew all about McPherson's status in the KKK and the state police likewise had received reports about McPherson's activities. Hesidenz advised Cook that without the tape or other corroborating physical evidence, nothing could be done. He told Cook to try to get the tape or anything similar if something happened in the future. Cook was unaware of any follow-up investigation on his report or any action being taken against any individual who was involved in showing or watching the ceremonial induction video. Cook was intimidated and frightened by the incident. McPherson retired from the Butler Works a few years later.

Class member Patterson also witnessed graffiti and experienced what he believed to be inappropriate harassment by co-workers while working in the cold mill. For example, he witnessed phrases such as "KKK for Dave Clark" and statements containing the word "nigger" near the work locations of minority co-workers, such as Derek Potts. Racial graffiti frequently was written on the console at his work station and at times degrading racial comments were written by a co-worker. Much of this graffiti was in plain view and the foreman and other management personnel would walk by it every day. Some of it was scrawled near telephones frequently used by management employees.

Co-workers and even crew chiefs made derogatory comments to Patterson. In addition, the crew chiefs in the cold mill continued to inform Cordray that Patterson was not ready to be certified on certain machines while giving less senior white employee more training time, resulting in quicker certification. Scott Hankey, who was training Patterson, told him: "I have to put my bigotry aside to train you, Jerry, but I'm willing to put my bigotry aside to train you." Hankey made this statement to Patterson on more than one occasion.[11]

Lake frequently witnessed racial graffiti at the Butler Works. The incidents included a

---

[11] Hankey made very similar statements to Derek Potts when he was being trained in the cold mill.

23

"KKK" symbol scratched into Lake's locker and phrases being written on the locker room and bathroom walls such as "the KKK lives at Armco" and "Kill the labor niggers." These incidents occurred in 1998.

Lake was also familiar with the noose in the hilltop silicone lunchroom. He became aware of it in 2002 after Patterson witnessed it and advised Lake of its presence. Lake learned that the noose had been there for at least three years and stopped by the lunchroom in order to verify its existence. There were two doors to the lunchroom, one of which provided a direct entrance to the mill. The noose was directly to the right. It was the same color as the background wall, but was clearly visible. Lake informed Derek Potts about the noose and called him into the lunchroom in order to witness it. The noose remained in the lunchroom until the EEOC site visit on June 30, 2003.

Class member William F. Jackson, III, worked in plant protection as a security gateman. Jackson was hired into security in 1981 and continued to hold a position in that department. He and Lake had been friends for over twenty-two years and often shared work experiences with each other. Lake had relayed several of the racial incidents occurring in the workplace over the years, including derogatory remarks from employees, offensive graffiti and so forth. Jackson had experienced similar behavior and believed he had been passed over for merit pay increases due in part to the racially charged environment within the Butler Works.

In July of 2001 Jackson found a sheet of drawings on his desk when he reported for day shift. The drawing contained ten symbols which, from Jackson's perspective, appeared to be symbols and sayings associated with racial hatred. Some of the symbols appeared to Jackson to reflect a Klansman's hood and variations of swastikas. The drawings also contained phrases such as "southern pride" and "night digger" which appeared similar to symbols associated with the KKK website. After finding the page of drawings, Jackson put it in a desk drawer and left it there. In November of 2002, after unrelated issues were raised at the Butler High School, Jackson re-examined the drawings and believed the matter should be brought to Winter's

24

attention for appropriate investigation. Jackson informed Winter of the drawing and directed him to the Anti-Defamation League's website. Jackson indicated he believed it had been left by someone working the night shift.

Winter conducted a brief investigation. After receiving the page of drawings and incident report, Winter asked Jackson if he knew who actually created it. Jackson did not. After viewing the symbols on the Anti-Defamation League's website, Winter took no further action. He did not view the document as depicting racist symbols and concluded it was nothing more than "doodles". Winter did not conduct any further follow-up or question any other employee or supervisor about the incident. In his judgment the drawings did not contain racially intimidating symbols.

In July of 2001 Jackson reported that an incoming truck driver had made demeaning and derogatory comments about an African American child playing in the neighborhood. Jackson completed an incident report which was forwarded to Winter. After receiving the report Winter confirmed that all information Jackson had was contained in the report and indicated a letter would be written to the trucking company. Winter informed Jackson that the driver would be barred, but the driver's name never appeared on AK Steel's barred contractors list. Around the same time, another truck driver made racially derogatory remarks about one of Jackson's co-workers and attempted to tell Jackson ethnic jokes. Jackson rebuked the attempt and completed an incident report. Winter again came to the Plant No. 2 gate and spoke to Jackson. The driver subsequently was barred from entering the Butler Works.

During the course of one of the investigations Jackson asked Winter how he perceived the Confederate flag. Winter had just explained that when incidents of a racially harassing nature occurred, the company was required to take corrective measures. When specifically asked about the Confederate flag, Winter indicated he did not view the flag as being racially motivated or charged.

Defendant has a written anti-harassment policy which according to Winter mandates a

25

"zero-tolerance" response for violations. In general, employees seeking to register a complaint are directed to report their claims either to Human Resource Officer Rick Winter or Manager of Industrial Relations, L. William Gonce. Gonce and Winter assertedly maintain a "hand-in-hand" relationship in enforcing defendant's anti-discrimination policy at the Butler Works. Any investigation into complaints of unlawful harassment are conducted by Winter or individuals acting at his direction.

Defendant's written policy prohibiting unlawful discrimination was revised on November 28, 2000. It prohibited all forms of unlawful discrimination in accordance with state and federal law, including harassment because of race. The policy required individuals who believed they were the subject of harassment, or who had observed or had knowledge of such activity, to report the matter to the human resources manager at the plant, the manager of industrial relations at the plant, or the corporate human resources department. It prohibited retaliation for good faith reporting or cooperating in an investigation, and indicated defendant would accept complaints regardless of whether the offending conduct rose to the level of harassment under the law or defendant's policy. Employees were informed that "the investigation" would be conducted with as much confidentiality as could be provided consistent with a thorough investigation, but that disclosure to appropriate personnel would occur in order to insure an adequate investigation. Sexual harassment was defined and explained in some detail, but other forms of harassment were identified only as verbal or physical conduct based on race, color, religion, national origin, age or disability that unreasonably interfered with an individual's working performance or created an intimidating, hostile or offensive working environment. Negative stereotyping, threatening, intimidating and hostile acts were all prohibited.

On May 17, 2002, defendant again revised its policy. The revised policy directed individuals to report any harassment or observation or knowledge of such activity to the human resources manager, the manager of industrial relations or the corporate human resources department. The policy prohibited all unwelcomed comments or conduct directed at employees

26

because of their sex, race, color, religion, national origin, age or disability regardless of whether the conduct actually constituted unlawful harassment. Examples included slurs, negative stereotyping, threatening, intimidating or hostile acts and pornographic materials. The employees were informed that they were responsible for notifying security at the particular location of any threats, threatening behavior or acts of violence.

Defendant's policy was further revised in February of 2004. At this time an ethics and compliance hotline with an "800" number was added. This was the first opportunity for employees to give an anonymous report about activities believed to be unethical or illegal.

Defendant's initial policy directed individuals who were harassed or observed such activity to report the matter to the employee's immediate supervisor as well as the human resources manager at the plant, the manager of industrial relations at the plant, or the corporate human resources department. The revision of the policy on May 15, 2000, specifically removed immediate supervisors from the reporting chain and mandated that employees report such matters to one of two high ranking plant officers. It was not until February 2, 2004, that an anonymous means of reporting was supplied by creation of the ethics and compliance hotline.

Winter oversaw the investigation into every complaint at the Butler Works. When an employee wanted to "file" a charge, Winter informed the employee that he did not use written forms or record the formal allegations. Instead, he simply sat down with the employee and collected all the information through an interview process. He then investigated the claim or directed others to do so and reported the results of his investigation to the complainant.

When Winters became aware that an employee was considering making a charge, he would routinely contact the employee's department and leave a message with the head of the department directing the employee to contact him. He would then set up an appointment, and at times had an assistant accompany him during the interview process.

When Winter received information suggesting that racially offensive conduct had occurred he would investigate the matter by interviewing the individuals alleged to have been

27

involved. For example, when he became aware of the alleged showing of a video tape reflecting KKK activity, Winter interviewed McPherson. A union representative was present. McPherson disavowed any membership in the KKK, any leadership position, that he had ever brought a tape to work, or that his daughter or family members were involved in the KKK. Winter reported the results of his investigation to class members Lake, Jackson and Cook, and ended his investigation.

Winter similarly investigated graffiti on Cook's locker and concerns Cook had about statements or conduct by his co-workers, including co-worker Mike Chuba. After hearing the various statements and racial jokes that Cook indicated his co-workers had made, Winter asked Cook who could corroborate Cook's story. Cook was unwilling to provide names, but after Winter insisted, Cook explained that Winter was already aware of the people working around Cook. Winter then conducted a series of interviews with each of those individuals. They disavowed having engaged in any such conduct or making any statements with racial overtones. From Winter's perspective, "that was the end of that."

Winter conducted a similar investigation into complaints of disparate treatment by Patterson. Winter first interviewed Patterson in 2003, and Patterson raised issues of prior treatment. Winter listened to Patterson and the two discussed the issues. Winter perceived Patterson's complaints as "historical for the most part" and concluded that because the incidents had occurred in the distant past, nothing could be done. With regard to more recent matters concerning how Patterson's return to work calculations had been developed, Winter explored the matter and attempted to explain it to Patterson. Although Patterson did not agree with the explanation, Winter took no further action on the matter.

Patterson called Winter when someone posted a newspaper article regarding the "EEOC lawsuit" in the main plant locker room and highlighted Patterson's name in the body of the article. Winter already was aware of the posting and had had it removed. Because a number of people used the locker room, Winter concluded that there was no way to determine who had

posted the article. That was the end of the matter.

Patterson also called about graffiti appearing in a restroom which stated something to the effect of "the big, fat lazy nigger doesn't deserve a job." Winter "marshaled some forces," went down to the location and spray painted over the graffiti.

Plant protection had the responsibility of producing an incident report after receiving notification of an accident or incident within the plant. The department also had responsible for taking photographs and documenting information pertaining to any investigation within the plant.

On February 1, 2002, a memo was distributed to plant management advising them that any posters, photographs, books, calendars and other materials that violated defendant's harassment policy were to be removed from the work site by the supervisor of the area and an incident report was to be completed regarding the supervisor's observations and actions. In a meeting held on February 11, 2002, Winter indicated he was continuing to find items out in the plant that violated defendant's anti-harassment policy. Hesidenz then sent a memo to plant supervisors and protection personnel indicating Winter was continuing to find items out in the plant that violated defendant's policy and questioning why supervision was "not uncovering them?".

When defendant revised its discrimination policy in May of 2002, plant protection was provided with new directions for handling reports associated with ethnic or sexual harassment. Hesidenz issued the following directive:

> If Security gets a contact/complaint related to the Subject (graffiti ...), the policy is to refer the caller to Bill Gonce and/or Rick Winter for the purpose of investigation and correction.

> Security will not do formal incident reports, take photographs, etc.

Hesidenz followed up with a confidential communication indicating he still wanted a voice mail and log notation regarding all reports/complaints. Hesidenz thereafter deleted all voice mails regarding such reports/complaints after listening to them.

Hesidenz repeatedly sent e-mails to supervisors and plant security members containing

29

ethnic jokes. On November 15, 2001, he published a "joke" about Polish marines with a caveat that "anyone of Polish decent, don't take offence." On March 20, 2003, he forwarded a "joke" about two Arabs. And on one other occasion he forwarded a "great chain letter" that contained sexual innuendo. Hesidenz was never formally reprimanded for engaging in this conduct. Instead, Winter merely advised him at one point that his actions were inappropriate.

In conjunction with charges of discrimination filed by Lake, Patterson and Jackson, the EEOC requested an on-site tour of the Butler Works. A few days prior to the scheduled visit laminated placards were posted at common locations throughout the plant warning that defacement of plant property, including graffiti, was prohibited and that violations would result in discipline, up to and including discharge. In addition, Winter organized a massive effort to paint over any graffiti existing in the plant. Winter, other members of the human relations department, and members of the industrial relations department painted over various portions of walls, bathrooms, stalls, lockers, shower stalls and the like. The EEOC investigators nevertheless came upon swastikas and a picture of a person with an "Afro hairstyle" captioned with the words "Leroy, great American scab."[12]  In addition, they found the noose in the hilltop lunchroom. An employee sitting next to it remarked that it "ha[d] been there three (3) years." All of the main areas in the plant had sections that recently had been painted. Areas containing graffiti that did not have racial connotations had not been painted. Upon inquiry, Winter admitted the areas had been painted within the last twenty-four hours and stated he regularly had management personnel check their assigned areas and remove graffiti.

Winter testified that pursuant to his direction management would not tolerate graffiti and it was "routinely" removed. When asked whether regular patrols were conducted, Winter indicated he as well as other management personnel would go out into the facility looking for graffiti "periodically" and if it was found or reported it is removed. When questioned about how

---

[12]One of plaintiffs' counsel is prepared to offer historical information indicating this phrase was associated with blacks who were imported into the steel mills in the Pittsburgh area in the late 1800's during work stoppages when unions were trying to get organized.

30

often such campaigns had been conducted, Winter could neither identify the last time such measures had been taken before the EEOC on-site visit or how long it had been since the last such effort had been undertaken. Nor could he recall any distinct pattern or frequency about when such measures were taken. Instead, Winter would from time to time merely walk out into different areas of the plant and "do spot checks."

Winter submitted an affidavit in support of defendant's motion for summary judgment indicating he covered graffiti in the plant and documented racist graffiti that he found or that had been reported. During his deposition, however, Winter explained that he immediately covered over all racial graffiti and only had photographs taken when something was found that was unique or different. Winter had no photographs of racial graffiti. He did, however, have pictures of graffiti that depicted swastikas where a reference to AK Steel accompanied it. On occasions when such graffiti was found, Winter directed plant protection to come and photograph it. Winter had no documentation of the racial graffiti directed at specific class members, such as the comment about Patterson not deserving a job.

Winter also attested that managers were trained on equal employment opportunity and harassment policies, and the anti-harassment/discrimination policy had been conspicuously posted throughout the Butler Works. Each employee had been provided with a copy of the policy by mail. Winter and Gonce had attended training on AK Steel's policy at company headquarters in November of 2000. Sign-in sheets from a review and training session on the policy also indicate Cordray, Boehm, Randolph, Gonce and McGarvey attended an instruction session regarding equal employment policies and harassment and work place violence policies, which covered the topic of race discrimination. McGarvey, however, could not recall any details about the training other than management was prohibited from discriminating on the basis of sex, race, color or religion. Randolph could only recall attending sexual harassment classes prior to 2001 and could not recall attending any instruction or classes regarding racial harassment or discrimination. Gonce could recall only attending a session at a local community college on one

31

occasion in 2002 or early 2003 involving race relations and sensitivity issues. Beyond that the only other sensitivity training Gonce could recall was human resources management personnel such as Winter attending a stand-up safety meeting and explaining AK Steel's anti-harassment policy.

The record also contains several incidents involving the display of the Confederate flag on company property. One such incident involved security guard David Hodill. Hodill was employed by Johnson Controls, which had taken over part of plant security a few years after defendant acquired the Butler Works. Hodill displayed numerous Confederate flags on his vehicle, frequently drove past the main plant gate playing "Dixie" on his vehicle horn and parked his vehicle directly across from the main office or the plant protection office. Hodill displayed these symbols for months before Winter finally directed him to remove the emblems while on company property. Gonce, the only other chief plant official who was authorized to receive reports of harassment, joked to the union president and grievance chairman about attending his deposition "with my Confederate flag on."

Class member Frank Ross Lloyd, Supervisor of the Magnetic Testing Laboratory at the Butler Works, received direction to search out and remove any Confederate flags in the area under his control. After doing so, he witnessed a contractor's vehicle on plant property displaying the flag. He called plant security for clarification and learned that plant security had never been advised to remove such flags or tell incoming truckers to cover or remove them. He subsequently learned that other departments in the mill such as industrial relations likewise had not been directed to remove or prohibit displays of the flag. Lloyd discussed what he learned with Lake when Lake asked about defendant's policy about displaying the Confederate flag on company property. Winter learned of the discussion prior to Lloyd's scheduled deposition and advised Lloyd that "you made a mistake." Winter insisted that Lloyd should have come directly to him and not discussed the matter with others. Winter then asked whether Lloyd had "talked to other black employees about this kind of stuff?" Lloyd indicated he could not recall having done

32

so, and Winter indicated "there is some question here as to your allegiance and loyalty to this company." Winter hung up on Lloyd without further discussion. In a follow-up telephone call, Winter advised:

> Ross, listen up and listen good. I don't want any other conference on this. I don't want anything else in writing about this to me or anyone else in the company. I don't even want you to talk about this. If that's not clear, you call me.

Winter hung up before Lloyd could respond. Lloyd's deposition was taken on November 7, 2003, after which he was advised that he "talked too much."

On November 17, 2003, Winter and Lloyd's direct supervisor summoned Lloyd to a meeting. They advised Lloyd that he was being re-assigned from his office position as supervisor to a position requiring coil inspections in the steel mill. Lloyd had no experience in this work and it required him to work swing shifts alternating on a weekly basis, as opposed to the nine to five hours in his supervisory position. As Winter was explaining the changes, he had a big grin on his face and kept saying "don't worry, this isn't retaliation. We're keeping your pay the same."[13]

The polestar of defendant's motions for summary judgment is its contention that it cannot be held responsible for any conduct that occurred prior to its acquisition of the Butler Works on September 30, 1999. It asserts that it had no control over the environment prior to that date and its anti-discrimination policy and the measures taken to address any racially-based incidents or complaints that surfaced thereafter sufficiently defeat plaintiffs' claims or otherwise shield it from liability. Lake and Patterson emphasize the treatment they received from their immediate supervisors after defendant's acquisition as well as the "culture" that existed and continued to

---

[13]Although Lloyd's annual salary was not changed, his new position involved a lower pay grade which placed him at the top end of the scale. Thus, from that point forward he had no opportunity to earn raises and the maximum annual bonus he could earn was reduced by fifty percent. Lloyd maintained that there was no justified basis for his transfer and has filed a separate discrimination claim.

33

exist at the Butler Works.   The EEOC contends defendant can be held liable for the existence of a racially hostile work environment in accordance with the teaching of National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002).

Defendant views its liability for any pre-ownership acts as purely a question of law.  We believe it is dependant upon material questions of fact that remain in dispute.

In Morgan, the Supreme Court illuminated Title VII's concept of "an unlawful employment practice" as it relates  to discrete discriminatory acts and hostile work environments in clarifying the timeliness of Title VII claims.  A discrete discriminatory act, such as termination, failure to promote, denial of transfer, refusal to hire and so forth, constitutes a separate actionable "unlawful employment practice" and a charge challenging any such practice must be filed with the EEOC within one hundred eighty or three hundred days after the particular unlawful practice has occurred.  Id. at 110.  Timely filing a charge on a discrete act of discrimination does not make timely other discrete acts that occurred outside the time period, even if the untimely acts are related to the conduct giving rise to the timely filed charge.  Id. at 111-12.  In other words, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges [and] each discrete discriminatory act starts a new clock for filing charges alleging that act."  Id. at 113.  The converse is equally true. "The existence of past acts and the employee's prior knowledge of their occurrence, ... does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed."  Id. Nor is an employee barred "from using the prior acts as background evidence in support of a timely claim."  Id.

"Hostile environment claims are different in kind."  Id. at 115.  They are based on the cumulative effect of individual acts or repeated conduct, any one of which may not be actionable on its own.  Id.  It is the cumulative effect of such acts over a period of time, perhaps even years, that elevates the series of  acts to the level of an "unlawful employment practice." Id. at 115-17.

34

Thus, it does not matter that some of the component acts of a hostile work environment claim are outside the statutory time period because it is the cumulative effect of the entire series of acts that collectively constitute the "unlawful employment practice." Id. at 117. In other words, where "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by the court for the purposes of determining liability." Id. at 117. And the fact that an employer has engaged in sufficient activity to make out an actionable hostile environment claim does not preclude the employee from demonstrating that an unlawful employment practice is ongoing and continues to occur. Id. "Subsequent events ... may still be part of one hostile work environment claim and a charge may be filed at a later date and still encompass the whole." Id.

The general premise of defendant's position – that it cannot legally be held liable for acts of its predecessors over which it could not exercise control – has logical appeal and clearly enjoys precedential support in the context of discrete discriminatory acts. It also enjoys the same appeal with regard to any unknown hostile work environment existing at the time AK Steel acquired the Butler Works. But where a new employer discovers or should have discovered an existing hostile environment at a recently acquired facility and thereafter fails to take prompt and effective remedial measures calculated to eliminate it, the employer in effect permits the cumulative effect of the separate acts occurring before its ownership to continue. In such circumstances the employer permits a series of separate acts partly beyond and partly within its control to culminate in a statutory violation by permitting them to rise to or continue at a level of severity and pervasiveness sufficient to alter the terms and conditions of the victim's employment. In other words, it becomes responsible for the culmination of acts forming a single ongoing unlawful employment practice. When that occurs, we see no basis for artificially sheltering the defendant's exposure to liability for the entire unlawful employment practice.

It follows that defendant may not be held liable for the separate acts that occurred during Armco's ownership of the plant unless (1) they are part of a series of separate acts that

35

collectively constitute a single unlawful employment practice in the form of an actionable hostile work environment claim and (2) defendant is determined to be liable for the ongoing existence of that environment during its ownership. And contrary to defendant's protestations to the contrary, these are issues to be resolved by the finder of fact provided plaintiffs have proffered sufficient evidence to support their hostile work environment claims and defendant is not entitled to any affirmative defenses as a matter of law. Accordingly, we turn to the resolution of these aspects of defendant's motions.[14]

Title VII of the Civil Rights Act of 1964 prohibits discrimination "against any individual with respect to [his or her] compensation, terms, conditions, or privileges of employment, because of such individual's ... race." 42 U.S.C. § 2000 e-2 (a) (1). The prohibition "not only covers 'terms' and 'conditions' in the narrow contractual sense, but 'evinces a congressional intent to strike at the entire spectrum of disparate treatment of [minority and non-minority

---

[14] In concluding that defendant's liability for any separate acts occurring during Armco's ownership is factually dependent upon defendant's responsibility for the cumulative of those and related acts occurring under its watch, we have not overlooked the general principles underlying the doctrine of successor liability under Title VII. That doctrine is derived from equitable principles and permits an aggrieved employee to enforce against a successor employer a claim or judgment he or she could have enforced against the predecessor. Rego v. ARC Water Treatment Company of Pa., 181 F.3d 396, 401 (3d Cir. 1999). The policy is designed to protect employees when ownership of the employer suddenly changes and pertinent considerations include " (1) continuity in operations and workforce of the successor and predecessor employers; (2) notice to the successor employer of its predecessor's legal obligation; and (3) ability of the predecessor to provide adequate relief directly." Id. at 402 (quoting Criswell v. Delta Airlines, Inc., 868 F.2d 1093, 1094 (9th Cir. 1989)). Here, as explained more fully infra, plaintiffs' evidence will support a finding that there was continuity in the operations and managerial work force of Armco and AK Steel, and sufficient evidence exists to support a finding that defendant knew or should have become aware of ongoing conduct occurring during its ownership that would have provided reasonable notice of the existence of a hostile work environment. Furthermore, to the extent the notice of such conditions properly can be imputed to defendant, its liability is dependent upon the efforts it undertook to prevent and correct the ongoing existence of that environment. Under these circumstances defendant properly can be charged with the cumulative effect of the entire unlawful employment practice under consideration because Armco could not have provided adequate relief for the entire unlawful employment practice and defendant has subsumed through its own action or inaction responsibility for the cumulative effect of all the prior individual acts.

employees] in employment." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998) (quoting Meritor Savs. Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986)).[15]  "Title VII is violated 'when the workplace is permeated with discriminatory [race-based] intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the condition of the victim's employment and create an abusive working environment.'"  Ocheltree v. Scolon Productions, Inc., 335 F.3d 325, 331 (4th Cir. 2003) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). Employees are entitled to protection from "working environments [that are] so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers." Meritor, 477 U.S. at 66 (quoting Rodgers v. EEOC, 454 F.2d 234, 238 (5th Cir. 1971)).

Specifically, a prima facia case of a racially hostile work environment has the following elements: (1) the employee suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability. Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 276-77 (3d Cir. 2001).  Proffering sufficient evidence to meet each element of a hostile work environment claim generally precludes summary judgment in the defendant's favor and permits the plaintiff to proceed to trial. Id. at 280-281.

In analyzing whether a plaintiff has established a prima facia case, the court cannot confine its analysis to "the individual pieces of evidence alone," but must "view the record as a whole picture." Id. at 276 (citing Woodson v. Scott Paper Co., 109 F.3d 913, 921 (3d Cir. 1997)).  This is because "[a] play cannot be understood on the basis of some of its scenes but

---

[15]"[T]he elements and burden of proof that a Title VII plaintiff must meet are the same for racially charged harassment as for sexually charged harassment." Harrison v. Metropolitan Gov't. of Nashville and Davidson County, 80 F.3d 1107, 1118 (6th Cir.), cert. denied, 519 U.S. 863 (1967); see also Torres v. Pisano, 116 F.3d 625, 630 (2d Cir. 1997) (same); Morgan, 536 U.S. at 116 n. 10.

only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but the overall scenario." Id. (quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir. 1990)).

Defendant contends plaintiffs have failed to produce any evidence to establish the first element, i.e. that they suffered intentional discrimination because of race. It asserts that when each incident underlying plaintiffs' complaints is examined in context and considered in conjunction with the responsive actions undertaken by defendant, the record fails to reflect any evidence of discriminatory treatment based on race. It further contends that prompt remedial action was taken whenever warranted and the record reflects a legitimate basis for discipline whenever it was imposed. Thus, the evidence falls short of the quantum needed to prove racial animus.

The record contains sufficient evidence to support a finding that the class members' working environment was sufficiently charged with intimidation and ridicule that was directed at them because of their race. The record also contains sufficient evidence to support Lake and Patterson's contentions that they were held to higher standards and disciplined more frequently and harshly because of their race.

The record is replete with evidence indicating racially derogatory graffiti appeared in common areas throughout the plant. The graffiti frequently contained references to minority workers. Specific examples included the statement referencing Nathan Vanderzee, references to class member Ronald Edwards, drawings and statements referencing Kevin Frost, the depiction of Dave Clark in a jail cell about to commit suicide, and the statements referencing Patterson. This graffiti typically contained derogatory statements or slurs implying an inferiority of the individual because of his race. Such graffiti commonly remained on company property for lengthy periods of time, sometimes for months on end. The graffiti was only removed after a specific complaint was made, and even then the same or similar graffiti reappeared within a short period of time.

38

Graffiti directed at African American workers in general likewise repeatedly and regularly appeared during defendant's ownership of the Butler Works. Statements such as "kill all the labor niggers," "kill all them niggers," "no niggers wanted here at the melt shop," and "this place is getting to be nigger heaven" routinely appeared on walls and doorways in common areas throughout the plant. Symbols of white supremacy such as "KKK" and depictions of Klansman also were prevalent in areas where they could be observed by members of the general workforce. A noose was erected in a lunchroom next to an area used by management and remained in plain view for several years.

Beyond the graffiti, derogatory references to African Americans in the form of racial epithets and jokes were common. Numerous class members testified that derogatory phrases such as "nigger-rigged" and statements such as "what do I look like, you're nigger" were common in the workplace. Displays of the Confederate flag on company property routinely occurred. The other symbols of hatred and racial intolerance also were present in the workplace. Swastikas frequently appeared in areas used by the common workforce or on company property that moved throughout the Butler Works. In addition, derogatory statements appeared about Muslims and/or darker skinned individuals of Middle Eastern origin.

There is little doubt that a "reasonable jury could find statements like the [ones referenced above] send a clear message and carry the distinctive tone of racial motivations and implications." Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1083 (3d Cir. 1996). Certain statements directly conveyed the "message that members of a particular race are disfavored and that members of that race are, therefore, not full and equal members of the workplace." Id. Beyond these statements, class members testified to "the pervasive use of derogatory and insulting terms directed at members of a protected class generally, and addressed to those employees personally, [which] may served as evidence of a hostile environment." Id. (citing Andrews, 895 F.2d at 1485.)

The record when viewed as a whole also raises an inference that the use of racial graffiti,

39

racial insults and racial/ethnic jokes was condoned by management. Numerous class members testified that the racial graffiti appeared in areas accessible to management employees and commonly frequented by them. Graffiti routinely appeared in bathrooms, locker rooms and common entrance ways that were used by employees and management personnel alike. The graffiti remained in such locations until someone made a formal complaint about it. Ethnic jokes and racial epithets were commonly used by non-minority employees. A high ranking supervisory officer disseminated ethnic jokes on more than one occasion without meaningful reprimand and others failed to recognized and sought to make light of the displays of a symbol imbued with racial hostility. Furthermore, complaints by class members concerning racial graffiti or offensive treatment resulted in open investigations involving the class member's immediate co-workers. This in turn resulted in non-cooperative attitudes being directed at minority workers and tension and disruption in working relations. The lack of cooperation by co-employees directly impacted the ability of the minority employee to perform in an efficient and productive manner.

Defendant argues that a number of the symbols, statements and conduct referenced by plaintiffs cannot be understood to have racial connotation. For example, it notes that several class members conceded that the display of the swastika in the workplace was done in a way that reflected an editorial comment on AK Steel's management style, likening it to the strict totalitarian approach of the Nazi regime. At times, the swastika was accompanied by the symbol "AK" over it or "fuck AK" and phrases such as "I love Adolph Wardrop," which referred to chief executive officer Richard Wardrop. Defendant also notes that some of the class members testified that they understood the swastika graffiti to convey this connotation and thus defendant asserts that the class members should not be heard to disingenuously complain that the swastikas contributed to a racially offensive environment. Other instances include testimony by Patterson indicating co-workers "humped" him and poked him in the chest in front of management personnel without repercussion and McGarvey testifying that other employees told her that they thought Lake got away with not doing his job because he was black.

40

Of course, "racial epithets need not be hurled at the plaintiff in order to contribute to a working environment [that is racially hostile]" Jackson v. Quanex Corp., 191 F.3d 647, 661 (6th Cir. 1999). Title VII affords employees the right to work in an environment free from "discriminatory intimidation, ridicule and insult, Meritor, 477 U.S. at 65 ..., without limiting this concept to intimidation or ridicule explicitly racial in nature." Id. (citing Andrews, 895 F.2d at 1485 (holding that overt racial harassment is not necessary to establish a hostile environment) (parenthetical added)); see also Aman, 85 F.3d at 1083 (same). "All that is required is a showing that race is a substantial factor in the harassment, and that if the plaintiff had been white he would have not been treated in the same manner." Aman, 85 F.3d at 1083. Indeed, general harassment often forms an integral and important part of proving the existence of an intentional hostile work environment and courts must resist the appeal to "disaggregate" each non-overt act and consider it in a vacuum. Durham Life Ins. Co., v. Evans, 166 F.3d 139, 149 (3d Cir. 1999). Similarly, there is no "talismanic expressions" needed to advance a racial harassment claim and "code words" and symbols may convey a clear message of racial intimidation based on the environment in which they appear and the context in which they are used. Galdamezv Potter, 415 F.3d 1015, 1024 n.6 (9th Cir. 2005).

The above principles preclude the approach advocated by defendant for two basic reasons. First, we are not permitted to engage in a myopic view of the record or disaggregate the components of a hostile environment claim in a manner that robs them of their cumulative effect. Jackson, 191 F.3d at 660 (collecting cases); Andrews, 895 F.2d at 1484; Durham Life, 166 F.3d at 149. While the record does contain evidence suggesting that the swastikas were at times used to convey dissatisfaction with defendant's management of the working environment, swastikas also symbolize a belief of Arian superiority and the need to brutally oppress any other race or ethnic group perceived as inferior. Swastikas are a symbol of a regime of hatred unparalleled in world history. That regime was dedicated to the oppression of those of Jewish heritage through genocide. The symbol is one of hatred and oppression. Archulet v. American Airlines, Inc.,

41

2000 WL 65688 (C.D. Cal. 2000); E.E.O.C. v. Foster Wheeler Constructors, Inc., 2002 WL 976618 (N.D. Ill. 2002). And it can support a racially hostile environment claim in violation of Title VII when combined with similar symbols of racial hatred and bigotry. See Bryant v. Independence School District No. I-38 of Garvin County, 334 F.3d 928, 932-33 (10th Cir. 2003) (displays of Confederate flag, swastikas, KKK symbols and hangman's nooses on clothing and vehicles coupled with racial slurs, graffiti inscribed in furniture, and derogatory notes in students' lockers and notebooks created actionable racially hostile environment in violation Title VI where school administrators either facilitated the environment or permitted it to continue); Gooden v. Timpte, Inc., 2000 WL 34507333 (D. Col. 2000) (code words, racial epithets, swastikas and hangman's noose provided evidence of actionable hostile work environment).

Furthermore, defendant's contention that the swastikas appeared only in a manner implicating its management style is an inaccurate reading of the record. Numerous class members indicated the swastikas often appeared without reference to AK Steel. Thus, like other symbols of racial hatred, the display of swastikas cannot be summarily isolated and discounted in assessing whether the environment has a whole reflected conduct directed toward plaintiffs because of their race.

Patterson's account of his interaction with Keith Say similarly cannot be treated in such a manner. Overt racial harassment need not be proven to establish a hostile work environment. Durham Life, 166 F.3d at 148-49. General harassment can and often does reflect an important component of an abusive work environment. Id. at 149; Aman, 85 F.3d at 1083. All that is required is a showing that if the plaintiff had been white, he or she would not have been treated in the same manner. Aman, 85 F.3d at 1083.

Patterson's testimony concerning the incident with Keith Say satisfies the above standards. Read in proper context, the thrust of Patterson's testimony was that the confrontational conduct by Say was witnessed by foremen and supervisors and it would not have been permitted to occur and/or a response by management would have been immediately

42

forthcoming had it been directed at a Caucasian employee. And although the incident is relatively minor in isolation, it is improper to "disaggregate" it on the ground that it was only general harassment that was independent from any racial hostility claimed by plaintiffs.

Similarly, the presence of the noose at the Hilltop Silicon lunchroom cannot be disregarded because plaintiffs have produced no direct evidence that specific plant supervisors or management personnel witnessed it. It is beyond question that relevant facts may be proven by circumstantial evidence. Several class members and the union president testified that the lunchroom was in close proximity to an area used regularly by managers and supervisors, and that supervisors often went into the lunchroom in order to give assignments, provide direction or converse with employees. There is also evidence that the noose was in the lunchroom for an extended period of time, possibly over three years. Thus, notwithstanding that the noose was the same color as the woodwork behind it, there is ample evidence to support findings that its existence was known to management and it was permitted to remain in the lunchroom for an extended period of time.

Second, the United States Court of Appeals for the Third Circuit's jurisprudence has "never required a plaintiff to demonstrate direct proof that her harasser's intent was to create a discriminatory environment." Abramson, 260 F.3d at 278. Indeed, the first prong of the inquiry was not "designed to protect harassers who fail to recognize the hostile or abusive nature of their comments and actions." Id. And it is improper to parse through the plaintiff's evidence in search of a link between the harasser's conduct and a discriminatory animus in his or her mind. Id. at 277-78. Instead, "[t]he proper inquiry at this stage [is ascertaining] whether a reasonable factfinder could view the evidence as showing that [the plaintiff's] treatment was attributable to her [race]." Id. at 277. In other words, the intent to discriminate can be inferred from the entire context and the conduct of the actors involved.

The class members have proffered sufficient evidence to satisfy this element of their claim. Plaintiffs have produced evidence which will support findings that their work

43

environment consistently was permeated with racial epithets, jokes and signs and symbols of racial hatred and intimidation. Taking into account all of the testimony by the class members, the finder of fact could determine that racial graffiti and epithets routinely appeared in the specific areas were minority workers were assigned to work as well as in the common facilities used by large segments of the work force. Class members frequently experienced disparaging jokes with racial overtones. Offensive graffiti was permitted to remain for extended periods of time and quickly re-appeared after being covered over. Symbols and badges of racial oppression were erected or displayed in common areas such as lunchrooms, locker rooms and restrooms. Class members experienced incidents of open hostility from co-workers and the witnessing of this treatment by management generated little or no response.

Such "an abundance of racial epithets and racially offensive graffiti could hardly qualify as offhand or isolated." Jackson, 191 F.3d at 662 (rejecting view that "each minority employee would have to show that the employer had a interest specifically to harass her, and could not proceed on a theory that the employer had a general intent to harass all employees of the minority group."); Bryant, 334 F.3d at 932-33; Ocheltree, 335 F.3d at 333 (open derogatory sex-specific harassment on plant floor sufficient to permit a finding that hostile work environment existed because of victim's sex); Oncale, 523 U.S. at 80 (same); Sykes v. Franciscan Skemp Healthcare, 2000 WL 34235984 (W.D. Wis. 2000) ("it is unquestionably the case that writings such as 'nigger' and 'nigger go home' in plaintiff's work area constitute actionable harassment"); Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668, 673-75 (7th Cir. 1993) (the presence of racial epithets and the use of slurs such as the word "nigger" essentially constitute specific instances of harassment directed at an employee because of her race). It follows that the cumulative effect of the plaintiffs' evidence concerning the environment at the Butler Works is more than sufficient to support a finding that the conduct was directed at plaintiffs because of their race. See Aman, 85 F.3d at 1083 ( "There are no talismanic expressions which must be invoked as a condition-precedent to the application of the laws designed to protect against

44

discrimination.").

Lake and Patterson also have proffered sufficient evidence to support a finding that they suffered harassment because of their race. Defendant posits that each tangible incident forming Lake and Patterson's claims involved a proper basis for discipline, and when a review of the record is undertaken to determine whether each employment action was a form of or taken in response to any particular complaint of racial harassment, the incidents do not provide any link to discriminatory animus or create an inference of improperly motivated conduct. But as noted above, that is not the test which this court must apply. The question is whether a reasonable factfinder could conclude from a comprehensive review of the evidence that the treatment underlying the plaintiff's hostile environment claim was attributable to his or her race. In making this assessment the court is not permitted to act as a factfinder and resolve the competing inferences that can be drawn from the evidence. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 286 (3d Cir. 2000). Instead, the evidence must be considered in the light most favorable to the non-movant, with all reasonable inferences being drawn in that party's favor. Id. In addition to the evidence pertaining to the general environment noted above, when the specific circumstances surrounding the instances of alleged disparate treatment advanced by Lake and Patterson are viewed in context and as a whole, the finder of fact could conclude that the conduct was attributable to their race.

McGarvey was the recipient of numerous racially-based comments from Lake's fellow employees. She recalled being told on a number of occasions that Lake gets away with not doing his job because he is black. She was also told repeatedly that Lake had a habit of "killing time," but had not received similar comments or reports concerning any other non-minority employee. She could not recall who had made these statements to her and defendant has produced no evidence to substantiate either allegation. McGarvey took no action to correct the racial overtones when these remarks were made, nor did she refer any employee for counseling and/or racial sensitivity training.

45

After receiving this type of information, McGarvey admittedly formulated a tracking system through which to monitor the specific movements of the two van drivers under her supervision. In addition, Lake received four instances of discipline within eight months: an eighteen day suspension, a ten day suspension, a five day suspension and discharge. It was unusual for such severe discipline to be imposed for the first time infractions involved and/or prior to utilizing warnings and less severe sanctions in accordance with the progressive discipline practices customarily employed. Against this backdrop Lake's complaints of discriminatory treatment were dismissed as not worthy of belief after summary interviews with McGarvey.

The proper comparison for evaluation of Lake's treatment is not whether Lake can identify other employees in the storeroom department who McGarvey believed were "killing time" and not doing their job, as defendant posits, but whether the factfinder can conclude that Lake was held to higher standards and more readily disciplined by McGarvey because of his race. There is ample evidence from which the finder of fact may make such a finding.

McGarvey did not impose the monitoring system on the stakes truck driver who was white and Lake has proffered evidence from which the finder of fact can conclude that she did not enforce it against the other white van driver within the department notwithstanding her proclamations to Winter and Bergbigler that she did. Randolph, an individual who helped manage the storeroom department, admitted the tracking system was designed by McGarvey to monitor Lake's whereabouts. McGarvey was unwilling to permit Lake to drive the stake truck until there was proof that his seniority rights permitted him to do so.

The finder of fact could conclude that McGarvey had no evidence that Lake had been killing time or not doing his job beyond unsubstantiated and unverifiable rumors. These rumors were indicative of a consistent theme in the work place graffiti that African American workers were lazy, untrustworthy and undeserving of a job. Findings that the monitoring system was designed and employed essentially as a means to monitor Lake's whereabouts and the basis of McGarvey's believed need to do so was formulated in part on stereotypical beliefs associated

46

with the color of Lake's skin are well within the province of the finder of fact. And of course, action taken against a minority employee based on negative stereotyping can be construed by the finder of fact as evidence of discriminatory treatment because of race. See Durham Life, 166 F.3d at 148 ("[H]ostile or paternalistic acts based on perceptions about womanhood or manhood are sex-based or 'gender-based.'"); Price Waterhouse v. Hopkins, 490 U.S. 228, 250-51 (1989) (plurality opinion) (reliance on gender stereotypes of appropriate female behavior is sex discrimination); Aman, 85 F.3d at 1082 (insults hurled at African American employees based on negative stereotyping such as "don't touch anything" and "don't steal" are "inherently racist remarks").

Similar inferences can be drawn from the circumstances surrounding the discipline McGarvey imposed on Lake. McGarvey confronted Lake about the delivery of the pocket knives in a manner that clearly implied he had stolen them. She did so in a humiliating and insulting fashion that suggested he was untrustworthy. She had no evidence that Lake had taken the knives or that he had done anything untrustworthy. She imposed unprecedented discipline when Lake reacted to her insinuations in a loud and agitated manner. The discipline was not consistent with the progressive discipline policy commonly practiced at the Butler Works, nor was it consistent with an approach formulated solely on the facts and circumstances known to her at the time. It is within the bounds of reason for the finder of fact to infer that McGarvey accused Lake of theft based on negative racial stereotyping and imposed discipline that would not have been imposed on his white counterparts when he reacted negatively to the insinuations created by her statements and actions.

McGarvey also confronted Lake after she learned he had delivered packages without obtaining verification of the time of delivery and made him engage in what can be found to be humiliating and demeaning conduct. There is evidence  that the other van driver and the stake truck driver did not have to comply with the tracking policy and/or they were not subjected to similar humiliating and demeaning conduct when they delivered packages without verification or

47

recording the date and time of delivery.

Finally, the finder of fact may infer that McGarvey treated Lake in a very demeaning and unwarranted manner on November 30, 2001, when he requested one hour off and thereafter attempted to comply with McGarvey's directive to provide a supporting explanation for the request. The summary denial of Lake's short day request after he failed to provide an immediate verbal explanation and continued to photocopy his written explanation was determined by the arbitrator to be petty and unwarranted, and provoked Lake to respond with vigor and projection. The finder of fact may draw the same inferences. There is also evidence indicating McGarvey has provided conflicting versions of the events that followed, with accounts that provide more support for the discipline imposed being given after the fact. Those accounts could be found to lack any independent corroboration and the jury could infer that the shifting explanations are mere pretext for unlawful treatment in the terms and conditions of employment. See Abramson, 260 F.3d at 284 (ever-shifting reasons for adverse action undermine credibility and provide evidence of pretext); Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994) (inconsistencies and contradictions are proper basis to prove decision was the product of discriminatory animus).

The record also contains circumstantial evidence from which the finder of fact can infer that McGarvey harbored and acted on racial bias. McGarvey was known to have made racially insensitive remarks in the workplace. An employee who worked in the same office overheard McGarvey comment to another that "it must have been scarey" working in New Castle because "there are a awful lot of black people there." This same employee got along well and had a good relationship with McGarvey until she placed a wedding picture on her desk that revealed her husband was an African American. Thereafter, McGarvey's treatment of the employee deteriorated significantly.[16]

---

[16]Defendant contends this statement is inadmissable as hearsay or double hearsay and is based on a remote incident in any event. But, McGarvey was a decisionmaker and agent of defendant and remarks by her reflecting inherent racial bias are neither hearsay nor stray remarks. See Abrams v. Ligholeir, Inc., 50 F.3d 1204, 1214-15 (3d Cir. 1995) (age related comments by supervisor

In light of the above, it is within the prerogative of the fact finder to conclude that Lake was subjected to higher standards than his Caucasian counterparts and was forced to endure demeaning and humiliating reprimands when he failed to meet those standards. The finder of fact will also have the prerogative to draw inferences from the evidence suggesting these higher standards may have been imposed on Lake in part because of certain unfounded suspicions or beliefs held by McGarvey, which beliefs can be found to correlate to inherently racist beliefs and viewpoints held by some segments of the American population and some of the employees at the Butler Works.

The treatment of Patterson likewise will permit the trier of fact to find he was subjected to similar treatment. Cordray supervised three employees who had similar absentee records. Of these three, only Patterson was African American. Cordray initially met with the two Caucasian employees and Patterson at about the same time in January of 2001 and issued written warnings to all three. Cordray met with Patterson for a second time about a month later and imposed a one day suspension for absenteeism after he missed three more days. Cordray did not follow the same course when one of the Caucasian employees missed three consecutive days about two months after the January meeting and then missed a fourth day approximately two weeks

---

were probative of supervisor's attitude toward older workers and thus admissible over evidentiary challenge as inadmissible hearsay and unrelated to decision under review); Walden v. George-Pacific Corp., 126 F.3d 506, 521 (3d Cir. 1997) ("Our cases distinguish between discriminatory comments made by individuals within and those by individuals outside the chain of decisionmakers who have the authority [over the employee]."); Abramson, 260 F.3d at 286 ("Under our case law, it is sufficient if those exhibiting discriminatory animus influenced or participated in the [adverse employment decision]" (collecting cases in support)). Nor does the fact that the statement was made years before the event in question bar its use to show inherent bias. Roebuck v. Drexel University, 852 F.2d 733, (3d Cir. 1988) (upholding admissibility of discriminatory comment by decisionmaker five years before adverse employment action). And it is beyond question that evidence sufficiently reflecting harassing or discriminating bias is admissible to prove intent or motive, the existence of a hostile environment and pretext. Aman, 85 F.3d at 1086. Indeed, such evidence can at times be critical to the interpretation of ambiguous treatment or the general harassment of an employee. Hurley v. Atlantic City Police Dept., 174 F.3d 95, 111-12 (3d Cir. 1999).

thereafter.

Cordray also employed a separate means of tracking Patterson's absences. He marked them on a large calendar which he kept on his office wall. All employees were able to see the calender and the markings denoting Patterson's absences, thus creating the image that he was deserving of special monitoring and ridicule. This was not done for either of the other two employees who had comparable records.

Cordray also imposed cumulative discipline on Patterson after the banding incident. Patterson was suspended for three days but the two Caucasian employees involved in the incident received only written warnings. Although defendant attempts to explain this discrepancy based on the cumulative difference in the employees' disciplinary records, it admits that discipline is determined on a case-by-case basis and need not be progressive. In fact, the company has been held to a standard requiring fair, proportionate and progressive discipline under the collective bargaining agreements. See Plaintiffs' Counter Statement of Facts Doc. No. 21 at ¶ 251. And there is no correlation between the grounds underlying Patterson's prior discipline and the circumstances of the banding incident. The inference that Patterson was held to higher standards and subjected to harsher discipline than his white counterparts is a permissible one.

Cordray also required Patterson to submit to drug testing more often than his white counterparts. And it is also undisputed that Cordray terminated Patterson after a first positive drug test. There is evidence from which the finder of fact can conclude that the first positive drug test was the specific reason for the discharge. No Caucasian employee had ever been discharged for a first positive drug test. Again, the inference that Patterson was held to higher standards and subjected to harsher discipline is a permissible one. Compare Aman, 85 F.3d at 1083 (evidence raising inference that race was a substantial factor in the harassment coupled with showing that if plaintiff had been white she would not have been treated in the same manner supports both a prima facia case of discrimination and a hostile environment claim).

Defendant argues the above inferences sufficiently are displaced because the record

50

contains supporting grounds for the discipline received by Lake and Patterson and the details surrounding each incident prove that no other employee had engaged in similar behavior. For example, when McGarvey questioned Lake about the missing knives, it cannot be disputed that Lake became loud and agitated and cursed McGarvey when he walked away. He also failed to follow McGarvey's directive to deliver packages when the tracking system was imposed and refused to talk to her when she demanded that he read the signature and dating requirements of that system aloud in front of his co-workers. Lake refused to provide an oral explanation for his request for one hour off, choosing instead to provide the explanation in writing and failed to follow a directive to deliver packages during the exchange that followed. Defendant further asserts that McGarvey's monitoring of Lake's whereabouts at the end of his shift because of the reports that he was killing time and her refusal to permit him to randomly select his starting time are minor trivial actions that fall short of the type of adverse employment action needed to support a claim of discrimination. Because the record contains no evidence that Caucasian employees under McGarvey's supervision behaved in a similar manner and the principal actions taken by McGarvey purportedly did not constitute adverse employment action, defendant posits that any disparate treatment claim must fail. In defendant's view Lake cannot prove he was singled out for different treatment and he is simply a victim of his own poor judgment.

Defendant advances similar arguments regarding Patterson's treatment. It argues that of the three individuals involved in the banding incident, Patterson was the only one with prior discipline. Similarly, Patterson acknowledged the seriousness of his absenteeism on more than one occasion, and nevertheless continued to miss work on days that raised a suspicion of drug use, warranting a random drug test that proved positive. From defendant's perspective, there was a valid basis for all discipline and drug testing and Patterson cannot identify any Caucasian who was in a nearly identical situation, thereby precluding any claim for disparate treatment.

As Lake and Patterson aptly note, they are not advancing claims based on discrete acts of discrimination; they are advancing a hostile work environment claim which includes instances of

51

specific disparate treatment. Such claims are by their nature "composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" Morgan, 536 U.S. at 117. Their burden is thus one of demonstrating that a series of separate acts collectively permeated the workplace with discriminatory intimidation, ridicule and insult that was sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment. Id. at 116. (quoting Harris, 510 U.S. at 21). They need not prove that any single act of harassment is actionable. Id. at 115.

But even assuming that the alleged disparate treatment underlying Lake and Patterson's complaint were required to withstand a discrete act of discrimination analysis, summary judgment in defendant's favor still would be inappropriate. First, defendant's position is based on an overly stringent understanding of the forms of actionable conduct. To be sure, suffering cognizable injury is a prerequisite to invoking the protections of Title VII as an aggrieved person. Storey Burns International Security Services, 390 F.3d 760, 764 (3d Cir. 2004). Such an injury is referred to as "an adverse employment action," which is defined as any employment action that is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." Id. (quoting Cardemas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001). This definition stems from Title VII itself, which defines unlawful employment practices to include "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race ... or to limit, segregate, or classify ... employees ... in any way that would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race ...." 42 U.S.C. § 2000e-2(a). Thus, discriminatory conduct other than discharge or refusal to hire is prohibited by Title VII if it alters an employee's "compensation, terms, conditions or privileges of employment" or deprives the employee of "employment opportunities" or "adversely affects [the employee's] status as an employee."

Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997).[17]

Notwithstanding defendant's contentions to the contrary, the evidence pertaining to the reprimands and discipline receive by Lake and Patterson will support findings that they have suffered materially adverse employment action.  Loss of money is not required to establish an actionable change in working conditions; instead adverse employment action can consist of a change in location, duties, perks, or other basic aspects of the job.  Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778, 787 (3d Cir. 1998).  Lake and Patterson both experienced discipline and terminations under circumstances that, as explained above, could be found to have been imposed as a result of being held to higher and more stringent standards.  And as defendant readily admits in its defense of Patterson's treatment, such discipline has clear impact and a cumulative effect on any further disciplinary measures.  The discipline and suspensions that occurred in this case reflect precisely the types of "terms, conditions and privileges" of employment falling within the scope of Title VII.

Defendant's contention that Lake and Patterson's claims are legally deficient because no sufficient comparators have been identified equally is misplaced.  First, a finding of pretext can be based on comparisons of employees that are similarly situated and both Lake and Patterson have identified other co-coworkers under their respective supervisor's immediate supervision who were Caucasian and treated differently.  In addition, Lake has provided evidence that his race did influence McGarvey's decisions in setting department policy and responses in dealing with Lake.  Cordroy's calendar depicting Patterson's absenteeism and imposition of discipline for the banding incident can be construed as significant circumstantial evidence of disparate

---

[17]It follows from these prohibitions "that 'not everything that makes an employee unhappy' qualifies as [a materially adverse employment action], for otherwise, minor and even trivial employment actions that 'an irritable, chip-on-the-shoulder employee did not like would form the basis for a discrimination suit.'" Id. (quoting Smart v. Ball State University, 89 F.3d 437, 431 (7th Cir. 1996)).  Under this standard "unsubstantiated oral reprimands" "unnecessary derogatory comments" and other minor negative treatment by employer does not rise to the level of a materially adverse employment action. Id. at 1301.

treatment based on race. Thus, the record contains ample evidence to permit findings of pretext based Lake and Patterson's treatment in comparison to the other white employees under the supervision of their foremen.

Moreover, establishing a claim of pretext is not merely limited to a comparison of treatment between similarly situated individuals in and outside the protected class. A claim of discrimination properly is submitted to the finder of fact where there is "some evidence, direct or circumstantial, from which [the] fact finder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Jones v. School Dist. of Philadelphia, 198 F.3d 403, 412-13 (3d Cir. 1999) (citations omitted).

Both Lake and Patterson have proffered circumstantial evidence suggesting they were held to higher standards and more readily subjected to discipline because of their race. The implications from McGarvey's confrontation with Lake concerning the missing pocket knives, the circumstantial evidence suggesting McGarvey harbored racial bias and the degree of discipline imposed for the infractions in questions will permit the finder of fact to conclude that invidious discrimination was a determinative factor in the discipline Lake received. Similarly, the prevalence of racial graffiti in Patterson's work area coupled with Cordray's failure to report or respond to the same in a timely manner, the display of the calendar depicting Patterson's absences, the degree of discipline imposed, and the frequency of the drug testing will, when all reasonable inferences are drawn in Patterson's favor, permit the same findings. When this evidence is coupled with the evidence surrounding the racial graffiti and that of the prevalent social attitudes in the workforce, there is more than sufficient evidence to support a finding of that discriminatory animus was a determinative factor in the discipline they received. Thus, defendant's contention that the record is devoid of the critical evidence necessary to support findings that Lake and Patterson suffered actionable disparate treatment is misplaced. Compare, Hurley, 174 F.3d at 110 ("evidence of harassment of other women and widespread sexism is also

54

probative of 'whether one of the principal nondiscriminatory reasons asserted by [an employer] for its actions was in fact a pretext for ...discrimination.").[18]

The record also contains sufficient evidence to prove the harassment forming plaintiffs' claims was pervasive and regular.  Title VII is violated only where harassment becomes "sufficiently sever or pervasive to alter the conditions of employment and create an abusive work environment."  Meritor, 477 U.S. at 67.  And it was not enacted to create a "general civility code for the workplace."  Oncale, 523 U.S. at 81.  Conduct which amounts to the "ordinary tribulations of the workplace" such as sporadic use of abusive language, off-handed jokes and occasional taunting and teasing is beyond the purview of Title VII.  Faragher v. City of Boca Raton, 524 U.S. 755, 788 (1998).  Conduct becomes actionable only where it is perpetrated because of a protected trait and has become sufficiently "extreme to amount to a change in the terms and conditions of employment."  Faragher, 524 U.S. at 788.

In ascertaining whether the level of severity and pervasiveness needed to find a hostile

---

[18] Plaintiffs have also proffered statistical evidence in support of their claims.  Lake and Patterson were both discharged under circumstances found to be in violation of standard practices and policies under the governing labor agreement. Union records indicate that between September of 1999 and December of 2001, an inordinate number of African American hourly employees were discharged.  During that time the total hourly workforce was just over 1,900 employees.  Fewer than twenty of those employees were African American.  Defendant issued twenty-two disciplinary suspensions with the intent to discharge.  Of those, six were filed against African-Americans and sixteen were filed against Caucasian employees.  Thus, statistically, less than one percent of Caucasian employees were discharged while over  thirty percent of the African-American employees were discharged during that brief period of time. While further briefing and consideration will be necessary to determine whether this statistical evidence properly should be admitted at trial, it is potentially capable of being reduced to admissible evidence and therefor cannot be summarily overlooked on summary judgement, at least as to defendant's contention that the treatment of Lake and Patterson cannot be viewed as disparate treatment.  See Stelwagon Manufacturing Co. v. Tarmac Roofing Systems, Inc., 63 F.3d 1267, 1275 n.17 (3d Cir. 1995) (citing Petruzzi's IGA Supermarkets Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1234 n.9 (3d Cir. 1993) and J.F. Fesser, Inc. v. Serv-a-portion, Inc., 909 F.2d 1524, 1542 (3d Cir. 1990) (hearsay statements and other forms of objectionable evidence may be considered if the evidence would be admissible at trial or is potentially capable of being reduced to a form of admissible evidence).

environment is present, "it is settled law that courts [are not to] consider each incident of harassment in isolation." Durham Life, 166 F.3d at 155 (citing Andrews, 895 F.2d at 1484). Instead, the sum total of the abusive or offensive conduct must be evaluated. Id. This includes an analysis of "the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment." Cardenas, 269 F.3d at 261. This is the only approach consistent with the repeated directives of the Supreme Court that a hostile work environment claim is to be evaluated under a totality of the circumstances approach and in a manner that focuses on the existing "environment" in question. Jackson, 191 F.3d at 660 (citing Andrews, 895 F.2d at 1484 in support) ("[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario.")); Abramson, 260 F.3d at 279 ("no one event alone stands out from the rest, but all the events could be found to aggregate to create an environment hostile to a person of Abramson's religion.").

"Harassment is pervasive when 'incidents of harassment occur either in concert or with regularity.'" Andrews, 895 F.2d at 1484 (quoting Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1189 (2d Cir. 1987)). And "the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." Ellison v. Brady, 924 F.2d 872, 878 (9th Cir. 1991); Wanchik v. Great Lakes Health Plan, Inc., 6 Fed. Appx. 252, 263 (6 th Cir. 2001) (same). At base, the severity and pervasiveness evaluation is "quintessentially a question of fact." O'Shea v. Yellow Tech. Servs., Inc., 185 F.3d 1093, 1098 (10th Cir. 1999) (citations omitted).

The class members have proffered sufficient evidence to prove the workplace was permeated with racial slurs, epithets and graffiti coupled with instances of general harassment, insult and ridicule to a degree that reflected a severe and pervasive hostile work environment. Read as a whole, each class member's testimony reflected the persistent existence of racial graffiti, symbols of hatred and racial slurs about minority employees. Their testimony indicated

the display of the offensive graffiti and the writing or uttering of racial slurs and epithets consistently occurred in or around the common work areas where minority members were assigned. A number of class members testified to repeated exposure to racial slurs, derogatory "jokes" and openly hostile attitudes by co-workers from the time AK Steel acquired the Butler Works through the time the class member's deposition testimony was taken in the latter part of 2003 or the early months of 2004. Their testimony was uniform in indicating the written racial slurs and symbols of hatred regularly appeared in areas utilized or frequented by management.

Perhaps the best evidence of a pervasive hostile environment at the Butler Works during AK Steel's ownership comes from its own witnesses. When questioned about the tracking system imposed on the van drivers in the storeroom department, McGarvey admitted that a number of employees had complained to her that Lake was getting away with not doing his job because he is black. She also received repeated reports that Lake had a habit of "killing time," but did not receive similar comments or reports concerning any other non-minority employee. The finder of fact will be free to infer that such evidence reflected part of a complex tapestry of discrimination when examined in conjunction with management's overall response to such conduct and the other specific instances of harassing, disparate or retaliatory treatment of individual class members.

Similarly, the finder of fact may conclude that defendant's massive campaign to eliminate graffiti and written derogatory statements one day prior to the EEOC site visit in effect acknowledged the persistent and extensive existence of offensive symbols and written racial slurs and epithets. The finder of fact may well infer that the need to conduct such a cover-over campaign reflected management's recognition that the existence of such symbols and statements was more than isolated or sporadic. In addition, the finder of fact will have before it several instances where class member experienced harassing and intimidating conduct directly. These include the image left for class member Holmes the day after he was written up for failing to tie his boots, the repeated slurs concerning class member Edwards and the general harassment

57

Patterson experienced from his co-workers. Furthermore, a number of class members testified that the open forms of investigation conducted by Winter whenever a potential violation was reported in turn caused class members to experience difficulty in their working relations with co-workers. Other incidents include the showing and viewing of a video depicting a KKK induction ceremony and the display of a noose for several years in a common work area routinely frequented by management. Taken as a whole, the finder of fact can conclude that of the record warrants a finding that the hostility in the working environment was pervasive and severe.

Defendant argues that merely identifying specific instances of distasteful or offensive conduct that occurred years and at times decades before it acquired the Butler Works, followed by isolated or unrelated incidence in 2002 or 2003, fails to identify a sufficient continuity to the plaintiffs' claims. In addition, it asserts no class member has identified a course of conduct that is sufficiently extreme to alter an employee's terms and conditions of employment as required under Faragher. Each position is unavailing.

Relying on cases which hold that two racially-charged incidents in the workplace or a few racial insults and slurs by co-workers and a supervisor fails to supply evidence of a severe and pervasive hostile work environment, defendant maintains that the racial slurs, "slip-ups" and work place graffiti, while indisputably offensive, cannot support a finding that the class members experienced severe or pervasive harassment because many of the past instances identified occurred years prior to any incident allegedly occurring during its ownership. A review of the record reveals, however, that the class members repeatedly testified that there was continuity to the racial hostility they experienced.

For example, defendant notes that class members Edwards only specifically identified two instances of racial graffiti in common areas, a racially offensive posting on a bulletin board, a swastika on a railroad car and a co-employee engaging in a "slip of the tongue" by using the term "nigger rigged," all of which he failed to report as violations of defendant's anti-harassment policy. But Edwards' recounting of his experiences reflected a level of continuity that

58

defendant's reading of the record fails to appreciate. Edwards testified that racial graffiti in and around his work site started to appear somewhere around 1983 when he was first assigned to work in Plant No. 2 along with vandalism to his vehicles. It had a consistent theme: "pretty much nigger Ron, black ... ." Subsequently he bid into the cold mill and after a short period of time the graffiti resurfaced. It continued "from '83 on" in the form of "nigger Edwards" or "nigger Ron" and various other slurs and derogatory comments in the common areas where he was assigned to work. It continued as long as he remained on the plant floor, which was through July 31, 2003. Although he was familiar with and had received a copy of AK Steel's anti-harassment policy, he did not report the matters because in the past he had turned similar things in and nothing was ever done. He did not see any change in management when AK Steel acquired the Butler Works on September 30, 1999, and the same managers continued to be in charge of the same work sites and use the same facilities. No meaningful efforts toward change had occurred. was ever done. No individuals were ever disciplined. At best, the graffiti was sprayed over only to reappear a short time later. Being called a nigger, being told that he would not have been promoted had he not been a nigger, and hearing comments such as "nigger rigged" were regular occurrences. It was an environment he had to put up with for twenty-six years and it "got to be a way of life down there."

Class member David Potts' recollection was similar. Defendant notes only his recollection of the term "sand nigger" being heard five to ten times mostly around September 11, 2001, hearing the term "nigger" being used at work five times since 1995 and racially offensive graffiti being written on the walls, none of which he reported. But Potts recounted many more incidents. He identified the same graffiti referenced by the other class members. He witnessed racial slurs and derogatory graffiti in common areas of the melt shop, cold mill, Plant No. 2 and the main plant. These included racial slurs, KKK symbols everywhere, swastikas and similar statements of hatred about Arabs. Such graffiti appeared consistently in the areas until "this case started" and a "no graffiti" policy was instituted. After that people started cleaning things up.

59

From his perspective it was written "all over the place" and created a consistent "kind of tension in the air." And while the graffiti did not use his name personally, from his perspective it was directed at him because of his race.

The testimony of class member George Holmes was similar. He witnessed all the racial slurs of other African American employees, including Nate Vanderzee, Ron Edwards and Kevin Frost. Swastikas appeared on the railroad cars that traveled throughout the plant frequently. Demeaning jokes were told and repeated in his presence throughout his career, which began in 1997. He attempted to provide specific dates on each incident whenever possible. He fairly consistently reported racial slurs and derogatory writings to the appropriate turn foreman at the time, which included at least four different turn foremen. Only one foreman actively prohibited the use of racial jokes, slurs and comments. He experienced this environment throughout his career. And after the "tie your boots" incident Holmes was very disappointed that his two coworkers, which Holmes believed had nothing to do with the incident, were disciplined after Winter because involved.

Class member William F. Jackson, III, witnessed graffiti throughout the years he worked in security and was well aware of the reports of racial slurs, intimidating symbols and offensive conduct relayed by other class members such as Lake and Patterson. Following an incident at a plant gate in July of 2001, Jackson began to complete an incident report on any matter involving workplace harassment. He was aware of class member Cook's account of witnessing a video depicting a KKK ceremonial ritual. He also had heard of the noose hanging in the Hilltop Silicone lunchroom. After the incident in July of 2001, he began to complete an incident report on all instances involving potential workplace harassment. On two occasions he made direct complaints to Winter. One involved the page of "doodles" drawn by Johnson Control Guard Hodill and the second involved a Johnson Controls contractor that made a racially charged comment. Additional incidents included the display of Confederate flags on company property, and Lloyd being counseled by Winter regarding his disclosure to Lake about the inconsistency in

60

AK Steel's policy concerning the display of Confederate flags by contract employees and independent truckers.

Class member Cook indicated racial comments occurred many times in his presence. He did not report a number of incidents because he simply tried to avoid making waves and attempted to do his job. Racial slurs and derogatory statements as well as offensive symbols appeared in common areas from the 1990's forward, but he could not recall exact dates for particular instances. He did report the appearance of KKK symbols on lockers around the time Lake was experiencing difficulties with McGarvey. Cook also reported some of the instances of harassment from coworker Chuba. After Winter conducted an open investigation regarding the matter, Cook felt "black balled" by his co-workers and everyone stopped talking to him. Any meetings with Winter involving complaints essentially consisted of Winter asking the same questions over and over. Winter's meetings with Cook stopped as soon as Cook elected to take a union representative with him to a meeting with Winter.

Derek Potts similarly testified to persistent racially offensive graffiti and slurs in common areas at the melt shop, cold mill, Plant No. 2 and main plant. He had witnessed the swastikas, racial slurs concerning Arabs, KKK symbols and the like, as well as "slip-ups" involving racial slurs or comments "all the time." He was aware of the pictures depicting Dave Clark, numerous KKK symbols, the noose in the Hilltop Silicone lunchroom and numerous other incidents. He did not report these because if he reported everything he saw over the course of his employment, he'd be "reporting a lot of incidents."

Taken as a whole, the above testimony will support a finding that the atmosphere at the Butler Works was permeated with racial graffiti, slurs and epithets, offensive symbols of hatred and derogatory and demeaning depictions of individual minority employees. A number or class members testified or implied that this atmosphere was fairly constant from the time they were hired through the point of the EEOC's investigation in 2003. And although the individual members were only able to recall some of the specific instances and examples of conduct they

61

experienced, the detailing of a handful of instances coupled with testimony indicating similar conduct occurred regularly or consistently is sufficient to create a triable issue on the pervasive and regular element. See Torres, 116 F.3d at 631 ("if a jury were to credit Torres' general allegations of constant abuse, which were confirmed by her coworkers, it could reasonably find pervasive harassment, even in the absence of specific details about each incident.") (collecting cases in support)).

Furthermore, the class members' testimony as a whole indicates they generally were aware of the experiences of their minority coworkers. The cases are legion for the proposition that incidents of harassment and discrimination experienced by other minority members can contribute to and must be taken into account in assessing whether the workplace was sufficiently permeated with hostility. See Hurley, 174 F.3d at 111 ("evidence of other acts of harassment [on other minority members] is extremely probative as to whether the harassment" experienced by a particular plaintiff is discriminatory and whether the defendant knew or should have known that it was occurring despite the formal existence of an anti-harassment policy, especially where the defenses include the contention that the incidents were trivial and its written harassment policy is sufficient to insulate it from liability); Glass v. Philadelphia Electric Co., 34 F.3d 188, 195 (3d Cir. 1994) (an atmosphere of condoned harassment in the workplace increases the likelihood of specific instances of retaliation or discrimination) (citing in support Hunter v. Allis-Chalmers Corp., 797 F.2d 1417, 1421 (7th Cir. 1986) (affirming district court's decision to admit evidence of harassment against other black workers in discriminatory discharge case because the "evidence was relevant both in the showing that Allis-Chalmers condoned racial harassment by its workers and in rebutting Allis-Chalmers' defense that it had fired Hunter for cause.")); Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (because the critical inquiry focuses on workplace environment as a whole, other instances of harassment of a members of the plaintiff's protected class as well as members of other minorities can be used to demonstrate the hostility of a work environment) (citing Schwapp v. Town of Avon, 118 F.3d 106, 111-12 (2d Cir. 1997));

Hirase-Doi v. U.S. West Communications, Inc., 61 F.3d 777, 782 (10th Cir. 1995) ("evidence of a general work atmosphere, including evidence of other [minority members], may be considered in evaluating a [hostile work environment] claim."). There is more than sufficient evidence for the finder of fact to conclude that the common experiences of the class members reflected in the aggregate an environment permeated with pervasive and regular racial harassment.

Lake and Patterson also have proffered sufficient evidence to support a finding that the harassment they experienced was pervasive and regular. In addition to the evidence discussed above, the jury could find Lake and Patterson were held to higher standards and subjected to ridicule and harsher discipline by their supervisors over a period of several months. After maintaining an unblemished disciplinary record for nearly twenty years, Lake was subjected to unprecedented discipline and ultimately discharged within a very short period of time after coming under McGarvey's supervision. Patterson likewise was monitored closely by Cordray over a period of several months and similarly subjected to unprecedented discipline. While defendant has advanced justification for each separate disciplinary measure, it is the aggregate of the events that must be considered in evaluating the environment. Lake and Patterson's treatment from their supervisors began with modest discipline, but escalated to frequent and unprecedented measures in the months that followed. Lake was monitored and scrutinized far beyond the other employees under McGarvey's supervision and she treated him in a demeaning and humiliating manner on a number of occasions. She also attempted to ridicule him in front of his co-workers for failing to follow the monitoring system she had imposed to track his whereabouts. Cordray similarly displayed Patterson's ongoing absences to his co-workers and imposed discipline for those absences, but did not do the same for non-minority employees with similar records of absenteeism. Patterson also was the only employee to receive a suspension over the banding incident notwithstanding the fact that all three employees had the same disciplinary records when it came to incidents involving safety. He was subjected to drug tests far in excess of the other employees within his department and discharged in violation of

company policy. No non-minority employee had ever been discharged under similar circumstances. When viewed in the entire context each series of events could be construed as reflecting severe and pervasive harassment.

The record also will support a determination that the working environment of each plaintiff constituted a change in the terms and conditions of employment. Defendant strenuously contends plaintiffs have done nothing more than demonstrate that they believe they were victims of discrimination, and in light of the various remedial measures taken in response to any actual complaints about racial hostility, plaintiffs cannot prove the environment was objectively hostile or offensive. From its perspective the record fails to reflect any conduct that is sufficiently "extreme" to support liability under Title VII. We again must respectfully disagree.

Defendant aptly notes that the standards for judging hostility are designed to assure that "the ordinary tribulations of the workplace" are not substituted for the "extreme" conduct needed "to amount to a change in the terms and conditions in employment." Faragher, 524 U.S. at 788. And if the record contained only "isolated incidents of racial enmity" as defendant so strenuously contends, the conduct of which plaintiffs complain would not be actionable under Title VII. See Woodland v. Joseph T. Ryerson & Sons, Inc., 302 F.3d 839, 844 (8th Cir. 2002) (a handful of incidents where co-workers used racial epithets, three of which involved a direct reference to the plaintiff, the use of an obscene gesture on one occasion, and a remote and isolated incident involving a hooded figure, drawings of "KKK" and a swastika, which was promptly addressed through a staff meeting emphasizing that such conduct would not be tolerated and severe discipline would be imposed on anyone involved in its reoccurrence, was "neither severe nor pervasive enough to create a hostile work environment."); Snell v. Suffolk County, 782 F.2d 1094, 1103 (2d Cir. 1986) ("isolated incidents of racial enmity" do not violate constitute actionable conduct). But as noted above, the instant record reflects much more than a few isolated incidents of racial enmity.

As an initial matter defendant misapprehends the Court's reiteration in Faragher that

64

courts are to be vigilant in assuring only "extreme" conduct be permitted to supply the foundation for a finding of actionable workplace hostility.   To be sure, the Court has repeatedly emphasized that the "mere utterance of an ... epithet which engenders offensive feelings in an employee" does not in itself alter the conditions of the recipient's employment and create an abusive or hostile environment.  Harris, 510 U.S. at 21; see also Weston v. Pennsylvania Department of Corrections, 251 F.3d 420, 428 (3d Cir. 2001) ("[t]he mere utterance of an epithet, joke, or inappropriate taunt that may cause offense does not sufficiently affect the conditions of employment to implicate Title VII liability.").  But establishing the existence of an abusive work environment does not require a showing that the conduct affected an employee's psychological well-being or caused physical injury.  Id. at 22.  Title VII's protections come "into play before the harassing conduct leads to a nervous breakdown."  Id.  They also come into play without having to prove overt "economic or tangible discrimination."  Meritor, 477 U.S. at  64.

What is necessary is a showing that the abusive environment could reasonably be perceived and actually was perceived by the employee as hostile and capable of detracting from job performance, continued employment or career advancements.  Harris, 510 U.S. at 21-22; Faragher, 524 U.S. at 787 (to be actionable, an "objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one the victim in fact did perceive to be so.").   However such actual tangible effects need not be demonstrated to offend Title VII's broad rule of workplace equality. Id.; Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1277 (11th Cir. 2002) ("[t]he harassment need not be shown to be so extreme that it produces tangible effects on job performance in order to be actionable."); Brantley v. City of Macon, 390 F. Supp.2d 1314, 1327 (M.D. Ga. 2005) (work environment permeated with racial tension to the point of being "racially charged" is actionable without concrete evidence showing tangible effects on pay or similar terms of employment).  Hostility that alters an employee's working conditions for the worse is enough. Torres, 116 F.3d at 631-32 ("Whenever the harassment is of such quality or quantity that a

65

reasonable employee would find the conditions of her employment altered for the worse, it is actionable under Title VII, so long as the employee subjectively experienced a hostile work environment.").

There is no talismanic formula for determining when an environment objectively is hostile or abusive. Id. The determination must be made by "looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Faragher, 524 U.S. at 787-88 (quoting Harris, 510 U.S. at 23)). The cumulative and exacerbating effects of the harassment experienced by all minority workers may be considered where there is evidence that the plaintiff was aware of or familiar with the hostile events experienced by the others. Hurley, 174 F.3d at 110; Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) ("Remarks targeting members of other minorities, for example, may contribute to the overall hostility of the working environment for a minority employee."); Hirase-Doi, 61 F.3d at 782 ("[E]vidence of a general work atmosphere, including evidence of harassment of other [protected class members], may be considered in evaluating a claim.").

Read as a whole, the class members' testimony and accounting of racial epithets and slurs is more akin to a constant bombardment than a few isolated or sporadic instances, regardless of whether the evidence is confined to the four years reflecting AK Steel's ownership or the years preceding it. The offensive graffiti frequently was directed at specific minority employees and appeared in common areas near their work site. Intimidating symbols appeared regularly and were permitted to remain. Offensive racial graffiti and slurs remained visible until a complaint was made and then often re-appeared shortly after being covered over. The statements, slurs and graffiti followed minority workers from one job site to the next.

The record will also permit the finder of fact to make several additional findings or inferences. Effort by a minority management employee to inform another minority employee

66

about the lack of consistency in company policy concerning the display of a racially-insensitive emblem was met with a stern reprisal of dissatisfaction and questioning of his company loyalty by the individual in charge of defendant's anti-harassment policy. Complaints about matters of discipline were addressed through investigations that kept matters of discipline and disparate treatment separate and distinct, notwithstanding the fact that disproportionate and unprecedented discipline was being imposed on minority members. Plant security were directed to stop preparing incident reports or documenting any display of racially offensive material or conduct implicating defendant's anti-harassment policy. Initiation of complaints at the Butler Works concerning racial matters could only be done by meeting with one of two very high-ranking plant supervisors. Investigations into complaints of offensive or abusive conduct by co-workers were done openly and without confidentiality, and were followed by isolating and non-cooperative attitudes from co-workers. Such investigations primarily consisted of the questioning of anyone potentially involved followed by a proclamation that nothing could be done in light of the inability to substantiate the claim or identify the perpetrator or culprit.

In addition, certain class members were required to meet performance standards that were not required of non-minority employees working for the same supervisor, and any complaint about or the failure to comply with those standards resulted in humiliation and ridicule in front of others and/or unprecedented discipline. A significant number of the class members communicated with each other about racially-based or racially perceived incidents occurring at the Butler Works.

The longstanding atmosphere of racial slurs and epithets, offensive symbols and recurrent racial and ethnic jokes is in itself sufficient to support a finding that the environment would be objectively offensive and hostile to a reasonable minority employee. Compare Jackson, 191 F.3d at 662 ("an abundance of racial epithets and racially offensive graffiti could hardly qualify as offhanded or isolated" and will support "a jury finding that a work environment was racially hostile."); Rodgers, 12 F.3d at 673-75 (racial graffiti and epithets such as the word "nigger"

67

clearly qualify as forms and incidents of racial harassment); Allen v. Michigan Dep't of Corrections, 165 F.3d 405 (6th Cir. 1999) (use of racial epithets, racial slurs and intimidating symbols and depictions such as Klansmen, the "KKK" and nooses establish objectively hostile work environment). In addition, there is evidence to support findings that Lake and Patterson were held to more stringent performance standards and/or accused of misconduct by their immediate supervisor based on negative stereotyping and complaints about or failure to comply with those standards resulted in humiliation, ridicule and/or unprecedented discipline. Incidents such as the initiation of discipline over first-time infractions, the failure to investigate complaints through independent means, the ever-increasing imposition of discipline, exposure to humiliating and ridiculing conduct for failure to follow work directives, and being discharged under circumstances that violated established labor practices could all be found to have sufficiently altered the terms and conditions of each plaintiff's employment. See Aman, 85 F.3d at 1083 (evidence indicating employee is improperly accused of misconduct, subjected to inordinate discipline, overly scrutinized in job performance and given inconsistent directives coupled with statements by co-workers and management that could be understood as code words for racial animosity will support a finding of an objectively offensive racially-hostile work environment); Jackson, 191 F.3d at 665-67 (investigations that repeatedly produce no results followed by the posting of the company's anti-harassment policy can contribute to the objective hostility of the environment).

There is also sufficient evidence to support a finding of fact that the class members perceived the work environment as racially offensive. Several class members indicated they did not report specific instances of conduct or graffiti. Some members indicated they were used to such conduct and had come to believe it was just easier to take it in stride. Certain members also admitted that some of the conduct amounted to nothing more than innocuous teasing and taunting that was not personally offensive. At lease one member admitted to using racial epithets on occasion and only considered the use of such language offensive when it was used broadly as

68

opposed to being bantered about among friends. Others admitted that the displays of swastikas were understood by some employees to be a comment on defendant's management style and not as carrying racial connotations.

Nevertheless, the record when viewed as a whole will support a determination that the class members subjectively considered the overall environment to be racially hostile and abusive. A number of class members testified that the persistent slip-ups, offensive graffiti, racial jokes, and symbols of white supremacy created a persistent feeling of tension in the air and complaints about such depictions or treatment resulted in ostracization by fellow employees due to the way such complaints were handled. A class member in management was reprimanded for attempting to ascertain whether "company policy" on displaying the Confederate flag was uniform throughout the plant and was made to feel as if he was being punished for disloyalty when he disclosed to other class members that a number of departments were unaware of any policy on the matter. Other class members were held to higher work standards, subjected to harsher and unprecedented discipline, and discharged under circumstances that violated company policy while their complaints of discriminatory treatment were being routinely dropped as being unsubstantiated. Clearly, the fact that some class members tried to cope within the environment in a manner that caused the fewest repercussions given the results of their prior complaints does not equate to a finding that the environment was not subjectively perceived to be offensive, and, when all reasonable inferences are drawn in plaintiffs' favor, the record will support a finding that plaintiffs perceived the environment as a whole to be racially hostile and abusive.

Defendant vigorously challenges plaintiff's ability to establish the final element of a prima facia case: vicarious liability. It posits that the record lacks any reliable basis to charge it with having notice of many of the incidents underlying the class members' claim because the class members admittedly did not report incidents of harassment and specifically chose not to at times in order to create evidence to support the claims in this case. The record also purportedly shows it promptly responded to any reported complaints, there is no evidence that management

was aware of the other offensive workplace incidents and reasonable care was taken to provide a suitable work environment by establishing an appropriate anti-harassment policy with user-friendly reporting procedures. The policy was calculated to eliminate offensive or abusive conduct if properly used by the class members and it was disseminated to employees, reviewed with them and posted at appropriate locations throughout the plant. Consequently, from defendant's perspective, the circumstances surrounding the underlying conduct and its anti-harassment policy preclude the imposition of respondeat superior liability. We disagree.

In general, although Title VII is a remedial statute, its primary objective is to avoid harm. Faragher, 524 U.S. at 806. Consequently, the law and regulations under Title VII recognize an employer's affirmative obligation to prevent violations. Id. They also afford protection to employers that make reasonable efforts to discharge that duty. Id. Similarly, employees have a coordinate duty to use all reasonable means available to avoid or minimize any injury or damages flowing from Title VII violations. Id.

The standards governing employer liability for a hostile work environment differ depending on the source of the hostility. Clark v. United Parcel Services, Inc., 400 F.3d 341, 348 (6th Cir. 2005). Imputing liability for co-worker harassment is grounded in the employer's direct negligence. Ocheltree, 335 F.3d at 333-34. Where a co-worker is the source of the hostile environment, "liability exists where the defendant knew or should of known of the harassment and failed to take prompt remedial action." Kunin v. Sears Roebuck and Co., 175 F.3d 289, 293 (3d Cir. 1999) (quoting Andrews, 895 F.2d 1486); see also Clark, 400 F.3d at 348 ("In the case of a harassing co-worker, '[a]n employer is liable if it knew or should of known of the charged sexual harassment and failed to implement prompt and appropriate corrective measures.'") (quoting Hafford v. Seidner, 183 F.3d 506, 513 (6th Cir. 1999); Ocheltree, 335 F.3d at 333-34 (same); Jackson, 191 F.3d at 659 (same); Galdamez, 415 F.3d at 1024 ("Once the Postal Service actually knew (or reasonably should have known) about what Galdamez was experiencing, it was required to 'undertake remedial measures reasonably calculated to end the harassment.'")

70

(quoting McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1113 (9th Cir. 2004)).

In contrast, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." Faragher, 524 U.S. at 807. This liability is predicated on the theory that the "tortious conduct is made possible or facilitated by the existence of the actual agency relationship." Durham Life, 166 F.3d at 150. Liability is divided into two categories: (1) where no tangible employment action is taken, the employer may raise an affirmative defense predicated on the exercise of reasonable care to prevent harm; (2) no defense is available, however, where the supervisor's harassment culminates in "tangible employment action." Id. (quoting Faragher, 524 U.S. at 808). A tangible employment action is one that "constitutes a significant change in employment status, such a hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998). It likewise may be established by demonstrating a materially adverse change based upon other indices that are unique to the particular situation. Id. (citing with approval Crady v. Liberty National Bank & Trust Co. of Indiana, 993 F.2d 132, 136 (7th Cir. 1993)). In contrast, a demotion without change in pay, benefits, duties or prestige or even a re-assignment to a less convenient job or location is insufficient. Id. (citing with approval Kocsis v. Multi-Care Management Inc., 97 F.3d 876, 887 (6th Cir. 1996) and Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994)).

Where the reasonable care defense is available the employer may defend by establishing two elements: (1) it exercised reasonable care to prevent and correct promptly any harassing conduct; and (2) the employee unreasonably failed to utilize the preventive or corrective opportunities made available or to avoid harm otherwise. Faragher, 524 U.S. at 807; Hurley, 174 F.3d at 118. The existence of an anti-harassment policy with adequate complaint procedures suitable to the employment circumstances appropriately is considered under the first element. And whether the employee unreasonably failed to utilize a suitable policy or take advantage of

71

some other reasonable means to avoid harm is considered under the second. Faragher, 524 U.S. at 806-7; Clark, 400 F.3d at 348-49. The defense thus has both "active and inactive components: before the employer can benefit from the defense, it must prove both that it *acted* reasonably in preventing and correcting harassment and that the victimized employee unreasonably *failed to act* by not utilizing complaint opportunities." Clark, 400 F.3d at 349 (emphasis in original). The defense is lost if the evidence is insufficient to support either prong. Id.; Faragher, 524 U.S. at 808; Hurley, 174 F.3d at 118; Savino v. C.P. Hall Co., 199 F.3d 925, 932 (7th Cir. 1999) ("Thus, to merit an instruction on the Faragher/Ellerth affirmative defense the employer must show that: (1) the plaintiff endured no tangible employment action; (2) there is some evidence that the employer reasonably attempted to correct and prevent [the] harassment; and (3) there is some evidence that the employee unreasonably failed to utilize the avenues presented to prevent or correct the harassment.").

Defendant's efforts to insulate itself from liability as a matter of law through the reasonable care defense is unavailing for numerous reasons. First, the record contains ample evidence from which the finder of fact can conclude defendant had notice of the abusive environment of which class plaintiffs complain.

Satisfying the notice requirement under Andrews only requires a plaintiff to advance sufficient evidence to prove the defendant "knew or should have known" of the harassment. Kunin, 175 F.3d at 293-94. Sufficient evidence of actual or constructive notice will suffice. Id. at 294. Constructive notice will be recognized in at least two separate situations: "where an employee provides management level personnel with enough information to raise a probability of [unlawful] harassment in the mind of a reasonable employer, or where the harassment is so pervasive and open that a reasonable employer would have had to be aware of it." Id. (citing Zimmerman v. Cook County Sheriff's Dep't., 96 F.3d 1017, 1018-19 (7th Cir. 1996)).

While defendant denies that it had notice of any environmental conditions that were not reported to Winter, the record contains sufficient evidence to support a finding of notice.

72

Several class members indicated they reported incidents of harassment to their direct supervisors after they were first exposed to the environment, but little if anything was ever done to eliminate its reoccurrence. Defendant's predecessor was slow to respond to any formal complaint and graffiti reappeared within a short time of its removal, if it was removed at all. No perpetrator was ever identified and disciplined. No educational meetings were held with employees. Management essentially remained unchanged when AK Steel acquired the Butler Works on September 30, 1999. Certain class members reported incidents concerning racial slurs and graffiti to their immediate supervisors during the first couple of years after defendant acquired the plant. These complaints were met with similar responses. Defendant's anti-harassment policy directed supervisors to report incidents that potentially reflected a violation of the policy to Human Resources personnel until May 15, 2000, when defendant officially alleviated such individuals from having to report offensive conduct or events. Some class members continued to make periodic reports to their direct supervisors thereafter. As a whole, these notices to turn foremen and low level supervisors provide some evidence that defendant received direct notice of various aspects of the abusive environment. Compare Hurley, 174 F.3d at 118 (an employee only has to attempt a method that the employer has sanctioned for providing notice and has no obligation to exhaust every available method once agents of the defendant who can be presumed to act on the matter have become aware of the offending conduct or event); Kunin, 175 F.3d at 294 (liability can attach without a formal complaint by the employee where management level personnel gain enough information to raise the probability of offensive conduct with a reasonable employer); Young v. Bayer Corp., 123 F.3d 672, 675 (7th Cir. 1997) (finding it sufficient for a plaintiff to give notice to someone who reasonably should be expected to stop the harassment or refer the complaint up the chain of command to someone who can stop it) (cited with approval in Hurley, 174 F.3d at 118 n. 17); Jackson, 191 F.3d at 663 (the standard is not whether a specific employee reported the offensive conduct of co-workers; instead, the employee must demonstrate that the employer knew or should have known of the offending conduct and the finder of fact

73

may consider the reports of any minority employees that had the potential to satisfy this standard); Torres, 116 F.3d at 634 n. 9 ("An employer can be held liable if it had constructive notice of the harassment, that is, if officials sufficiently high in the management hierarchy should have gained knowledge of it through the exercise of reasonable care.").

Beyond the evidence and inferences pertaining to direct notice, the finder of fact will also be able to consider two significant pieces of circumstantial evidence generated by defendant. First, on February 11, 2002, defendant's head of plant security issued an email regarding defendant's "Harassment Policy" to the members of plant security informing them that the topic at that morning's meeting was "posters, photos, books, calenders, etc.," that were offensive either "sexually [or] ethically...." It was reported that "Winter is finding items when he was out in the plant" and security personnel were asked: "why are you not uncovering them?"

Second, defendant initiated a massive paint-over of graffiti throughout the plant just prior to the EEOC's site visit on June 30, 2003. When questioned about this incident, Winter claimed to have "routinely" removed offensive material from plant property, but could not identify the last time this "routine" was carried out prior to the EEOC site visit or how often such measures were performed.

The inference that Winter was well aware that offensive racial slurs and graffiti "routinely" appeared throughout the plant (or at least of the tendency of this environment to be perpetuated) is a permissible one. Both the February 11, 2002, email from Hesidenz and the massive paint-over provide strong evidence that the chief officer in charge of defendant's harassment policy was well aware of a persistent offensive and abusive environment at the Butler Works. At the very least, the finder of fact may conclude from this circumstantial evidence alone that a reasonable employer would recognize the probability of an ongoing offensive and abusive environment and that knowledge of a hostile environment properly should be imputed to defendant.

The finder of fact may also determine that the racial harassment at the Butler Works was

74

so pervasive and open that a reasonable employer would have been aware of it. As previously noted, the class members essentially testified to a fairly constant bombardment of offensive racial slurs and epithets in the workplace with graffiti and symbols of white supremacy being prevalent in most if not all common areas of the major sections of the plant. Derogatory statements and drawings repeatedly appeared in common locations near the work sites where class members were assigned. Racial jokes were posted on bulletin boards and remained there until found and removed by minority workers. Ethnic and racial jokes circulated throughout the workforce, including to high level supervisors who in turn perpetuated their dissemination. High level supervisors were indifferent to, did not take serious and "joked" about incidents involving the presence of offensive or intimidating symbols. Comments about minority workers getting away with not having to perform their jobs because of the color of their skin were made to management personnel who then formulated department policy based on these comments. Collectively, these aspects of the record supply more than ample evidence to support a finding that the hostile environment was sufficiently pervasive and open to place a reasonable employer on notice of its existence.

Plaintiffs Lake and Patterson also have proffered sufficient evidence to support findings of notice regarding a hostile or abusive working environment fostered by their immediate supervisors. These class members directly and indirectly complained to Winter about being subjected to disparate treatment at the hands of their supervisors.[19]   Each relayed a series of past events concerning the environment as well as more recent treatment which they viewed as disparate and/or part of the overall atmosphere. To the extent the finder of fact credits these

---

[19] Patterson did not initially complain to Winter about being the victim of disparate treatment. Patterson made comments to a shift manager about the offensive graffiti and discriminatory practices within the Butler Works. The shift manager made Winter aware of the comments and Winter set up an interview with Patterson to discuss his concerns.   Of course, Winter's acquisition of notice through these channels provides further support for a finding that class members' complaints to their immediate supervisors should be viewed as constructive notice that properly is imputed to defendant.

accounts and concludes that minority workers such as Lake and Patterson were held to higher standards, subjected to inordinate discipline, overly scrutinized in job performance, improperly accused of misconduct, or subjected to humiliating and demeaning conduct by their supervisors because of their race, it will have necessarily determined as well that sufficient notice to alert a reasonable employer to the probability of a hostile environment was received by defendant's management level employees.

When the record is considered as a whole, it is apparent that there will be several avenues available for the finder of fact to find or impute notice to defendant. Thus, plaintiffs have met their burden to proffer sufficient evidence to establish this prerequisite for respondeat superior liability.

The record also contains genuine issues of material fact regarding whether defendant "exercised reasonable care to prevent and correct promptly any [racially] harassing behavior." Hurley, 174 F.3d at 118 (quoting Ellerth, 119 S. Ct. at 2270). Defendant maintains that its harassment policy and its responses to the matters reported by plaintiffs demonstrate that it exercised all necessary due care as a matter of law. From its perspective it implemented measures reasonably calculated to end any reported harassment by co-workers and its agents did not engage in any harassment or assist in perpetrating a hostile environment. Consequently, defendant argues it essentially did all it could do to prevent and correct any harmful conditions and therefore it is entitled to summary judgement. Several aspects of the record undermine this position.

As an initial matter, to the extent the finder of fact is convinced that Lake and Patterson suffered discipline as part of a racially hostile environment, then the due care defense will be unavailable for that discipline and the repercussions therefrom.[20] But even assuming defendant is

---

[20] The record sufficiently reflects that formal discipline such as a suspension or termination is treated commutatively at the Butler Works and therefore would constitute a materially adverse change in an employee's status. To the extent any such discipline is found to be part of the abusive environment it will therefore constitute tangible employment action against the employee

not precluded from raising its anti-harassment policy as part of a due care defense, material issues of fact remain regarding whether defendant exercised reasonable care under the circumstances and took adequate measures reasonably calculated to eliminate the abusive and offensive aspects of the environment.[21]

Defendant's attempt to insulate itself from liability based on the existence of its anti-harassment policy fails for a number of reasons. First, the applicable appellate precedent does "not, as the defendant seem[s] to assume, focus mechanically on the formal existence of a [anti-] harassment policy, allowing an absolute defense to a hostile work environment claim whenever the employer can point to an anti-harassment policy of some sort." Hurley, 174 F.3d at 118. In addition to satisfying the elements on paper, a stated policy must "suitable to the employment circumstances" and the record must reflect an adequate exercise of due care in attempting to both prevent and correct harassing behavior. Id.; see also Clark, 400 F.3d at 349-50 (the proper

---

and liability for that action will attach without the need to prove notice and failure to exercise due care. Faragher, 524 U.S. at 807; Durham Life, 166 F.3d at 150.

[21] To the extent defendant relies on its harassment policy to defeat any harassment perpetrated or condoned by its managers, defendant clearly bears the burden of proof and persuasion on each element of the Faragher/Ellerth affirmative defense. Faragher, 524 U.S. at 807; Hurley, 174 F.3d at 120 ("Faragher and Ellerth established that the defense of employer due care is an affirmative one."). As "the party who bears the burden of proof at trial, the standard [defendant must meet for summary judgment] is more stringent." National State Bank v. Federal Reserve Bank, 979 F.2d 1579, 1582 (3d Cir. 1992). In such circumstances the motion must be denied "even if no opposing evidentiary material is presented" provided the evidence referenced by the movement actually reflects "a genuine factual issue." Id. (citing Resolution Trust Corp. v. Gill, 960 F.2d 336, 340 (3d Cir. 1992)). We will assume that defendant bears the same burden to the extent it relies on its policy and the actions taken thereunder to overcome the proof that plaintiffs advance to establish that due care was not taken to correct promptly the components of plaintiffs' hostile environment claim and prevent future harassment. See Hurley, 174 F.3d at 118-19 (analyzing whether the defendant had conclusively proved the affirmative defense in response to a claim of co-worker harassment of which at least one of the defendant's agents had knowledge); Ocheltree, 335 F.3d at 333-35 (analyzing the evidence supporting the affirmative defense in concluding that the plaintiff had proffered sufficient evidence to support findings that the employer "knew or should have known about the [co-worker] harassment and failed to take effective action to stop it.").

inquiry in determining whether a defendant has sufficiently exercised due care in attempting to prevent and correct the alleged harassing behavior is not only on the existence and content of a harassment policy, but also the employer's implementation of that policy); Ocheltree, 335 F.3d at 335-36 (procedures under and manner of implementing a harassment policy must be analyzed in determining whether the defendant's harassment policy reflects a reasonable response to workplace harassment that is designed to provide prompt and effective measures to eliminate it); Thomas v. BET Soundstage Restaurant, 104 F. Supp.2d 558 (D. Md. 2000) ("An anti-harassment policy that an employer adopts must be 'both reasonably designed and reasonably effectual.'") (quoting Brown v. Perry, 184 F.3d 388, 396 (4th Cir. 1999)); Jackson, 191 F.3d at 664-66 (assessing the appropriateness of an employer's response and its potential effectiveness in eliminating and preventing future harassment under the circumstances presented are essential in evaluating an employer's invocation of the Faragher/Ellerth affirmative defense).

Defendant notes the record will support a finding that some responsive action was taken by Winter after he became aware of any explicit complaint of workplace harassment and argues that it could not correct or eliminate workplace discrimination that was not explicitly brought to its attention through an employee complaint. It further notes that on a number of occasions the harassment stopped after Winter's investigation. For example, when Lake informed Winter that someone from the combustion department was referring to him in a racially derogatory manner but was unable or unwilling to identify the perpetrator, Winter developed "an interview guide" and questioned everyone within that department. Although this approach did not reveal the culprit, the conduct thereafter stopped. Similarly, after William Jackson reported inappropriate conduct by contractors coming on to AK Steel property, Winter reported to Jackson that he had taken responsive measures and those contractors did not appear on AK Steel property thereafter. When Eric Cook reported that statements were made that made him uncomfortable and alluded that the statements were uttered by certain individuals working with him, Winter conducted a series of interviews with the employees. After each employee disavowed any knowledge of the

incident, Winter reported the results of his investigation to Cook and advised him that nothing more could be done. Cook did not report any similar conduct thereafter. The same approach was utilized with regard to the video tape showing of the KKK induction ceremony with the same result. When Holmes discovered the intimidating drawing referencing the citation for failing to tie his boots, Winter interviewed some of the employees that could have created the picture and, after he was unable to identify the culprit due to everyone's denials, Winter sent "a strong message" by disciplining the two employees who technically had violated defendant's policy by not immediately reporting the incident to him.

Winter also investigated the complaints of disparate treatment by Lake and Patterson. Winter used a similar approach when Lake made his first complaint about disparate treatment from McGarvey. Bergbigler was directed to read interview questions to McGarvey. The use of these questions led to plausible explanations for the conduct underlying Lake's complaint and therefore Winter informed Lake that McGarvey was just running a tighter ship.

A similar approach was employed in the matters Patterson indirectly brought to Winter's attention. Winter separated those incidents that were historical, and then examined the more recent matters concerning Patterson's work calculations. After determining that there was nothing inappropriate in the wok calculations, he advised Patterson that there was nothing improper in the calculations. Thus, Winter found no basis to support either Lake or Patterson's complaints and thereafter viewed their complaints about discrimination as matters separate and distinct from their complaints involving discipline or other workplace incidents.

Finally, Winter covered over any specific racial graffiti reported to him. And after this lawsuit was filed he conducted a plant-wide cover-over of all graffiti or symbols on plant property the evening before the EEOC's scheduled site visit.

Defendant maintains that these and similar aspects of the record indicate it took prompt and appropriate remedial measures regarding all explicit complaints of harassment brought to its attention and beyond that it cannot be faulted for failing to correct or eliminate unknown

79

workplace conditions or treatment that were not brought to its attention. As a result, it exercised a degree of due care that precludes liability.

Defendant's effort to limit its responsibility to only those incidents which plaintiffs formally reported is unavailing. "An employer cannot 'use its own policies to insulate itself from liability by placing an increased burden on a complainant to prove notice beyond that required by law.'" Hurley, 174 F.3d at 118 (quoting Williamson v. City of Houston, 148 F.3d 462, 467 (5th Cir. 1998). To the contrary "[t]he law is clear that 'an employer may not stand by and allow an employee to be subjected to a course of racial and/or sexual harassment by co-workers' or supervisors." Torres, 116 F.3d at 636 (quoting Snell, 782 F.2d at 1104). In other words, "once an employer has knowledge of the harassment, the law imposes upon the employer a 'duty to take reasonable steps to eliminate it." Id. And as explained above, the record contains numerous avenues that could lead to a finding that defendant had at least constructive notice that the "workplace [was] permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris, 510 U.S. at 21 (citations omitted).

Furthermore, the structure of defendant's policy creates material issues of fact regarding whether it was reasonably suited to the circumstances. "While there is no exact formula for what constitutes a 'reasonable' [racial] harassment policy, an effective policy should at least: (1) require supervisors to report incidents of [offensive] harassment, see Varner v. Nat'l Super Markets, Inc., 94 F.3d 1209, 1214 (8th Cir. 1996); (2) permit both informal and formal complaints of harassment to be made, Wilson v. Tulsa Junior Coll., 164 F.3d 534, 541 (10th Cir. 1998); (3) provide a mechanism for bypassing a harassing supervisor when making a complaint, Faragher, 524 U.S. at 808, 118 S. Ct. 2275; and (4) provide for training regarding the policy Wilson, 164 F.3d at 541." Clark, 400 F.3d at 349 (citations in original). Defendant's policy falls short of containing even these basic foundational planks.

First, the failure to place any duty on supervisors working with employees to report

incidents of harassment to those with full management authority is a factor the jury can consider in determining whether a policy reflected the exercise of due care. Ocheltree, 335 F.3d at 334 ("The first problem with Scollon Productions' complaint procedure is that, by the company's own admission, it fails to place any duty on supervisors to report incidents of [prohibited] harassment to their supervisors."). While defendant did place a reporting obligation on foreman and lower level supervisors for a brief time after it acquired the Butler Works, within six months it eliminated that responsibility from these individuals. These individuals were consistently on the plant floor and in close contact with the employees and their working environment. They were part of the working pulse of the plant and the jury may well conclude that removing their obligation to report inappropriate behavior or incidents reflected indifference and the lack of due care in preventing an abusive environment. See Ocheltree, 335 F.3d at 335 (lack of supervisor's responsibility to report harassment of which he or she is aware may be given "negative weight" by the jury in deciding whether a company has adopted a reasonably suited harassment policy).

A similar inference can be drawn from defendant's decision to withdraw any responsibility from plant security to document and create formal reports on the incidents that implicated defendant's harassment policy. This directive removed a formal means of documenting offensive or abusive incidents and displays and narrowed rather than expanded the collection of information concerning violations of defendant's policy. The finder of fact may well conclude that the decision expanded the opportunity for offensive and abusive conduct to flourish or go unreported. Faragher, 524 U.S. at 808 (efforts of employer to monitor and keep track of offensive or abusive incidents is pertinent to the employer's exercise of due care); Hurley, 174 F.3d at 118 (degree to which an employer monitors the acts of its employees is relevant to an employer's use of a harassment policy to establish due care).

In addition, the finder of fact may well conclude that defendant failed to adopt adequate channels for reporting potentially abusive or offensive incidents. On site reporting was limited to two of the Plant's highest supervisors. And there is no evidence that Gonce ever handled any

complaint or report of harassment. Employees wishing to make a complaint were required to meet personally with Winter and discuss their concerns directly with him. And there is no evidence that a report telephoned directly to company headquarters would have resulted in a different method of inquiry and investigation. A jury may find fault with a procedures that forces an employee to muster up the courage to contact and meet with an upper management supervisor over any matter involving an incident that could involve defendant's discrimination policy. See Ocheltree, 335 F.3d at 335 (requiring employee to complain directly to top management supervisors can be found to undermine effective reporting due to the psychological impediments created from forcing employee to muster the courage to complain to top management over every incident).

Defendant's policy also failed to contain mechanisms that would permit both formal and informal reporting. Numerous class members testified about the lack of confidentiality in Winter's investigation of any incident brought to his attention. The record contains incidents where class members Lake and Cook expressed concern about particular incidents in the workplace but wanted to have the matter handled informally or discretely. But Winter's admitted approach was to contact the employee's department openly and indiscretely, leave messages for the employee to call him and openly conduct an investigation. Class members were unwilling to continue to make reports under such a system because of the reaction of coworkers whenever Winter became involved. The lack of avenues for informal reporting and the lack of confidentiality in exploring or investigating any reported concern involving coworkers are matters the finder of fact may conclude further undermined the reasonableness and effectiveness of defendant's policy toward fulfilling its obligation to eliminate conduct creating a hostile environment. See Thomas, 104 F. Supp.2d at 565-66 (the failure to provide confidentiality or protection from retaliation where there is evidence of prevalent hostility can support finding that policy was defective and dysfunctional, thus making it an inadequate response to the general climate which it must be calculated to address).

82

The finder of fact may also conclude that defendants' managers and supervisors received an inadequate degree of training to produce an effective implementation of defendant's anti-harassment policy.  When asked to describe any past training, McGarvey's response was simply to indicate the training she received merely reiterated the prohibitions in defendant's policy. Gonce recalled attending one offsite seminar presented by the EEOC sometime in the past, but this was the only racial sensitivity training provided, and otherwise the training consisted of (1) the occasional reiteration of the content of defendant's policy at a stand-up safety meeting or similar event and (2) the reporting procedures under the policy.  Step-up supervisors such as Randolph never received training on defendant's policy.  Plant Security never received training designed to promote effective implementation of defendant's policy and Winter expressly verified that  these individuals, who could be viewed as the ones most likely to come in contact with or become aware of racial incidents, were specifically instructed not to document or follow-up on any such incidents because  "security personnel are not trained on how to handle EEO and harassment investigations."  Admittedly, only Gonce or Winter had enough training to handle such matters.  A fair inference is raised that the vast majority of supervisors, management employees and other integral members of defendant's operations received no or only cursory training on handling racial incidents in the workplace and ethnic and racial issues among the rank and file members of the workforce.

In addition to the lack of the basic foundational planks noted above, other aspects of the record also create a material issue about whether defendant's  policy was "suitable to the employment circumstances" and suffices to establish the needed exercise of reasonable care aimed at eliminating and preventing future harassment.  Defendant correctly points out that its response need only be reasonably calculated to stop or end the harassment and, where it does, the standard of care has been satisfied.  See Bonenburger v. Plymoth Twp., 132 F.3d 20, 26 (3d Cir. 1997 (an employer may avoid liability by taking prompt remedial action "reasonably calculated to prevent further harassment"); Savino, 199 F.3d at 933 (an employer's response to complaints

of harassment "is adequate if it is reasonably calculated to end the harassment"); Kunin, 175 F.3d

294 ("Our precedents provide that when an employer's response stops the harassment, there

cannot be Title VII liability."). Defendant asserts that after any particular incident of harassment

was brought to Winter's attention he conducted an investigation and the harassment stopped or

the claim was determined to be unfounded, thus verifying the effectiveness of defendant's policy.

And it purportedly is without responsibility for the matters class plaintiffs failed to report. From

defendant's perspective that is the end of the matter. We again must disagree.

Satisfying the requisite degree of due care as a matter of law cannot be reduced to the

simple legal equation advanced by defendant. "While the affirmative duty on the part of the

employer will often include the requirement that it have some sort of [] harassment policy in

place, the duty does not end there." Clark, 400 F.3d at 349. "Prong one of the affirmative

defense requires an inquiry that looks behind the face of the policy to determine whether the

policy was effective in practice in reasonably preventing and correcting any harassing behavior."

Id. When examined as a whole, the record falls far short of reflecting a glowing report on the

effectiveness of defendant's policy.

Whether defendant's policy constitutes a response reasonably calculated to foreclose

subsequent harassment cannot be judged solely on the specific incidents class members reported

to defendant and its response to those reports. "An employer cannot avoid Title VII liability for

coworker harassment by adopting a 'see on evil, hear no evil' strategy." Ocheltree, 335 F.3d at

334. To the contrary, the reasonableness of a response must be judged by the knowledge the

employer had or should of had concerning the environment. Clark, 400 F.3d at 350-51 (incidents

of harassment of which the defendant should of known are properly considered in assessing

whether the adequacy of a defendant's response creates a jury question on the exercise of

reasonable care); Savino, 199 F.3d at 934 (adequacy of employer's response must be judged by

what the employer knew or should of known when it implemented a corrective measure);

Ocheltree, 335 F.3d at 334 (same). It also must be judged by the gravity and pervasiveness of the

84

harassment occurring within the workplace. Torres, 116 F.3d at 638; Jackson, 191 F.3d at 664-65 (the frequency and severity of the harassment must be taken into account in assessing whether a policy reflects a response reasonably calculated to end the harassment).

As explained above, the finder of fact may conclude that indicia of a racially hostile environment were prevalent throughout the plant over a long period of time, including during defendant's ownership of the Butler Works. The finder of fact may well also conclude that formal complaints of disparate treatment under defendant's anti-harassment policy were viewed circumspectly and investigated separately and distinctly from all other workplace matters. And those who sought to attest to or provide support for others who complained of racial harassment or an offensive environment were intimidated, ostracized and punished.

Moreover, the finder of fact may conclude that defendant was more concerned with "sanitizing" any incident that potentially raised the specter of disparate racial treatment and eliminating any actual proof of abusive or offensive conduct occurring in the workplace than with eliminating and preventing future harassment. During the first few years of its ownership defendant eliminated the formerly expressed responsibility of turn foreman and lower-level management to report incidents or events implicating defendant's harassment policy, and thereby removed from the channels of responsibility the individuals most likely to be aware of such conduct and to view offensive displays, and so forth. It also eliminated any formal reporting and documentation of such conduct or displays by plant security, thereby eliminating the routine generation of any documentation regarding matters violating defendant's "no tolerance" anti-harassment policy and/or pictures reflecting the prevalence of racial graffiti and oppressive or offensive symbols in the workplace. The investigation of all claims of disparate treatment, workplace harassment or offensive events or displays thereafter was conducted in a manner that eliminated the formal recording of the actual information reported by the complainant. Little or no documentation was made of graffiti or the display of inappropriate symbols except where those displays could be explained as having non-racial connotations, in which event specific

85

documentation was created and pictures were taken.

Although gradual and incremental, the elimination of the means by which reports of offensive or abusive conduct and displays could be reported and documented occurred when defendant's own internal communications and actions indicate it was becoming increasingly aware of the prevalence of such activity and certain class members' growing dissatisfaction with their working environment. And members of defendant's management that provided corroboration of the existence of such activities within the working environment were made to feel as if they had been disloyal to the company, ostracized and subsequently led to believe their actions warranted retaliation under circumstances where it could not be easily proven.

Furthermore, complaints of disparate treatment were routinely investigated through questionnaires and responses of management were accepted without further question. After management advanced a plausible explanation for the action taken, no further follow-up was undertaken and subsequent complaints regarding disparate treatment were considered as "separate and distinct" from matters of discipline. Investigations into matters raised by minority workers were conducted in an open and publicized manner with no concern about the reactions of or repercussions from the complainant's co-employees and immediate supervisors. No effort was made to monitor or compare the degree or proportionality of the discipline imposed on class members who made formal complaints. Complaining class members were discharged for minor violations after making formal complaints.[22] When the individuals likely responsible for anonymous offensive conduct could not be identified through direct questioning, no further

---

[22] For example, when Lake returned from medical leave after his discharge that was converted to a lengthy suspension, he was written up for a minor safety violation by Hodill, an individual about whom Lake had made complaints concerning the display of Confederate flags on company property. The "ticket" was then "superceded" by the imposition of discipline and discharge directly from the plant manager. The finder of fact could construe these events as evidence that complaints about the work environment fell on an unreceptive audience and those in management such as McGarvey who were the subject of similar complaints would be vindicated by upper management through the subsequent use of severe discipline in matters involving minor infractions.

investigation was undertaken and class members were repeatedly told that without independent proof nothing could be done. Employees making complaints that could not be verified were warned of the provision of defendant's policy permitting discipline for false reports, including discharge. No employee was ever disciplined for engaging in offensive or abusive conduct. No racial sensitivity or workplace etiquette training was conducted at either the workforce or managerial levels.

When the record is read in the light most favorable to plaintiffs and the reasonable inferences from that reading are drawn in plaintiffs' favor, it is clear that the finder of fact may conclude that defendant's anti-harassment policy lacked basic features which undermined its effectiveness and/or it was implemented at the Butler Works in a manner that essentially rendered it illusory and dysfunctional. The finder of fact could also determine that the administration of defendant's anti-harassment policy was done in a manner that condoned discrimination and permitted it to flourish. It follows that neither defendant's anti-harassment policy nor the evidence surrounding its implementation preclude plaintiffs from proving the elements necessary for vicarious liability. Consequently, defendant is not entitled to avail itself of the reasonable care defense as a matter of law and its motion for summary judgement must be denied.[23]

Finally, defendant's attempt to eliminate plaintiff Lake and Patterson's PHRA claims on the ground that the proceedings before the Pennsylvania Human Relations Commission

---

[23] The ability of the finder of fact to conclude that defendant was more concerned with sanitizing any incidents potentially implicating its anti-harassment policy than with eliminating and preventing future workplace hostility forecloses defendant's request for summary judgement on plaintiffs' prayer for punitive damages. Punitive damages are available under Title VII and § 1981 where the employer acted "with malice or with reckless indifference to the [employee's] federally protected rights." 42 U.S.C. § 1981a(b)(1). Findings that defendant subtly attempted to eliminate any concrete evidence of hostile or abusive incidents in the workplace, narrowed the channels designed to document any such incidents, increased the psychological pressures involved in reporting workplace harassment or disparate treatment and conducted investigations in a manner designed to disprove the claim rather than eliminate harm in the workplace would provide more than an adequate basis to support an award of punitive damages.

("PHRC") were terminated in a manner that forecloses further pursuit of their claims is misplaced. Right to sue letters were received from the PHRC before this action was commenced. They thus had the right to proceed in court notwithstanding the fact that the PHRC had not completed it processing of their consolidated charges within one year. See 43 P.S. § 962(c).

For the reasons set forth above, defendant's motions for summary judgement must be denied. An appropriate order will follow.

Date: April 27, 2006

David Stewart Cercone,
United States District Judge

cc:     John W. Murtagh, Jr., Esquire
        Murtagh and Cahill
        110 Swinderman Road
        Wexford, PA 15090

        Cathy Bissoon, Esquire
        Colleen A. Zak, Esquire
        Reed Smith LLP
        435 Sixth Avenue
        Pittsburgh, PA 15219

        Judith A. O'Boyle, Esquire
        Jacqueline H. McNair, Esquire
        Equal Employment Opportunity Commission
        21 South Fifth Street
        Suite 400, The Bourse Building
        Philadelphia, PA 19106

        M. Jean Clickner, Esquire
        Equal Employment Opportunity Commission
        1001 Liberty Avenue
        Suite 300, Liberty Center
        Pittsburgh, PA 15222